STATE of Utah, Plaintiff and Respondent,

v.

Robert SALMON, Defendant and Appellant.

STATE of Utah, Plaintiff and Respondent,

v.

Tommy Lee BENWELL and Robert James Salmon, Defendants and Appellant.

Nos. 16591, 16723.

Supreme Court of Utah.

May 29, 1980.

Robert J. Schumacher and Sheldon R. Carter, of Utah County Legal Defenders Association, Provo, for defendants and appellants.

Robert B. Hansen, Atty. Gen., Earl F. Dorius, Asst. Atty. Gen., Salt Lake City, for plaintiff and respondent.

HALL, Justice:

Defendants appeal their convictions of burglary [1] on the theory of entrapment.

Although certain facts are disputed by the defendants, the following believable evidence was adduced at trial. Prior to the events in question, defendants resided in the State of California. They communicated with a friend, one John Bucy, about coming to Utah. Bucy lived with his brother-in-law, Jamie Flowers, in Salt Lake County. Flowers testified that Bucy told him that defendants were coming to Utah for the purpose of robbing some Utah drugstores. On April 10, 1979, Flowers notified one James Gillespie, of the State Liquor and Narcotics Enforcement, of what Bucy had told him. Gillespie thereafter assigned agent Lloyd Hansen to contact Flowers for further information.

On the morning of April 11, 1979, defendants arrived in Utah and Flowers met them for the first time. Defendants were without means of supporting themselves and arranged to stay at Flowers' house during their visit. Inasmuch as their own car became inoperable shortly after their arrival, they asked Flowers if he would drive them around and point out some of the drugstores in the area. Later that day, Flowers met with Hansen who attached a listening device to Flowers' person. That evening Flowers drove Bucy and defendants through much of Salt Lake City, Draper, and Riverton. Hansen maintained surveillance from a following vehicle and listened to the conversation in the Flowers' vehicle through the listening device.

The following day, April 12, defendants asked Flowers if he knew of any drugstores outside of the Salt Lake City area. Flowers said he knew of two pharmacies and a medical center in Orem. Flowers was then asked to take defendants there, and also to loan them some of Flowers' tools. Flowers agreed, whereupon he informed Gillespie, Hansen, and the Orem City Police.

Late that night, Flowers drove Bucy and defendants to Orem. After defendants had seen the two pharmacies in the area, they asked Flowers to drive to the medical center. As they proceeded from place to place, they were followed by Gillespie and officers of the Orem City Police in unmarked cars, who were again able to listen to defendants' conversations through the listening device which had been planted on Flowers. When they arrived at the Cascade Medical Center, defendants got out of the car and entered the building carrying what appeared to be an empty white bag. Approximately fifteen minutes later, they emerged from the building dragging a heavy bag behind them. They got back into Flowers' car and were arrested shortly after the car left the parking lot. The car was searched and the following items were removed from the back seat by the arresting officers: a white pillowcase, a fire extinguisher, a telephone answering system, two AM–FM radios, an electric typewriter, a calculator, screwdrivers and leather gloves. Criminal charges were thereafter filed.

On May 8, 1979, defendants moved for dismissal on the grounds that they had been

1. U.C.A., 1953, 76–6–202.

entrapped.[2] At the hearing held on the entrapment issue, the court concluded that dismissal was not warranted as a matter of law, and therefore denied the motion and the case proceeded to trial. At trial, Flowers testified that he had never suggested that defendants commit a burglary or any other crime. This was corroborated by Hansen and Gillespie insofar as the conversations they had heard through the listening device. On May 30, 1979, defendants were convicted as charged before a jury, and were later sentenced to be confined in prison for a term not to exceed five years.

Defendants' principal contention on appeal is that the evidence established the entrapment defense as a matter of law.

The applicable statutory provisions [3] read as follows:

(1) It is a defense that the actor was entrapped into committing the offense. Entrapment occurs when a law enforcement officer or a person directed by or acting in co-operation with the officer induces the commission of an offense in order to obtain evidence of the commission for prosecution by methods creating a substantial risk that the offense would be committed by one not otherwise ready to commit it. Conduct merely affording a person an opportunity to commit an offense does not constitute entrapment.

\* \* \* \* \* \*

(4) Upon written motion of the defendant, the court shall hear evidence on the issue and shall determine as a matter of fact and law whether the defendant was entrapped to commit the offense. Defendant's motion shall be made at least ten days before trial except the court for good cause shown may permit a later filing.

(5) Should the court determine that the defendant was entrapped, it shall dismiss the case with prejudice, but if the court determines the defendant was not entrapped, such issue may be presented by the defendant to the jury at trial. Any order by the court dismissing a case based on entrapment shall be appealable by the state.

\* \* \* \* \* \*

In *State v. Taylor*,[4] the Court adopted the objective test as the method of determining whether a defendant has been entrapped. We acknowledged that prior to that time the Court had consistently considered the subjective test in deciding entrapment cases.[5]

The instant case was tried in May, 1979 and the *Taylor* decision was rendered in August, 1979. There is considerable discussion on appeal as to whether the *Taylor* decision should be applied retroactively. The general rule is that a change in the law has only prospective effect.[6] Nevertheless, we need not reach that narrow question inasmuch as we cannot conclude that under either test defendants were entrapped.

As stated in *Taylor*, the objective test does not prohibit the police from affording a person an opportunity to commit crime; it only prohibits active inducements on the part of the government for the purpose of luring an "average" person into the commission of an offense. The activity of the government in the instant case is significantly different from that present in *Taylor*.

In *Taylor*, the defense of entrapment was held to be available to the defendant on a charge of distributing for value a controlled substance. In that case, the female undercover agent and the male defendant had cohabited prior to the alleged offense, during which time both were heroin addicts who procured and injected their drugs in a

---

2. U.C.A., 1953, 76–2–303.

3. Id.

4. Utah, 599 P.2d 496 (1979).

5. The basic difference is that the subjective test looks primarily to a defendant's predisposition to commit the crime, whereas the objective test looks primarily to police conduct.

6. *State v. Kelbach*, Utah, 569 P.2d 1100 (1977); see also *State v. Kelbach*, 23 Utah 2d 231, 461 P.2d 297 (1969).

spirit of togetherness. They thereafter occupied separate dwellings but remained close friends to the point of sleeping together during the very month the agent contacted defendant for the purpose of making a controlled buy to obtain evidence to convict him. Defendant, an addict who had recently undergone detoxification, had personally experienced the agonies of withdrawal and was held to have been motivated to commit the crime by his sympathy, pity, and close personal relationship with the agent.

 The facts in the instant case are significantly different. As indicated *supra*, the believable evidence was that the intention to commit the crime was conceived by defendants before they ever arrived in Utah. As a private citizen,[7] Flowers warned the authorities of his suspicions, based on information received from defendants' friend, John Bucy.[8] After their arrival in Utah, Flowers drove defendants around to various drugstores, at their request. The government's conduct was limited to placing a listening device on Flowers' person and tailing defendants until they carried out their preconceived intentions. Neither Flowers nor the government did anything to actively induce the burglary. Such evidence does not indicate, as a matter of law, that defendants were entrapped, and the question was properly presented to the jury as a factual question. The statutory definition of entrapment[9] was given to the jury in the form of an instruction. The jury found that defendants were not entrapped. When there is a reasonable basis in the evidence upon which jurors could believe beyond a reasonable doubt that the crime was a result of a defendant's own voluntary desire and intent to commit the crime, the fact that a police officer merely afforded him the opportunity to commit it, does not amount to entrapment.[10] On the facts presented, we cannot upset the jury verdict to rule that defendants were entrapped as a matter of law.

 As an alternative ground for reversal, defendants contend that the trial court erred in refusing to admit certain testimony offered by one of the defendants.

At trial, a question was asked on direct examination by the defense which referred to Flowers' conduct in inducing defendants to commit the crime. The prosecutor objected to the following response: "Well, for one he drove us around. He was talking about . . ." The court excluded the testimony as hearsay.

Rule 63, Utah Rules of Evidence, provides, in pertinent part, as follows:

> Evidence of a statement which is made other than by a witness while testifying at the hearing offered to prove the truth of the matter stated is hearsay evidence and inadmissible . . .

It appears that the excluded testimony was offered, not to prove the truth of what Flowers said to defendants, but rather to show that Flowers had made statements which induced defendants to commit the offense. Whether or not Flowers' statements were true is irrelevant, since the crucial factors are that the statements were made and that they influenced the defendants' behavior. The testimony was therefore improperly excluded as hearsay. Nevertheless, in light of other testimony given at trial, the error in excluding the testimony was not prejudicial to defendants. Defendants' proffer of proof attempted to show how defendants were induced into committing the crime. The following interchange is extracted from the transcript:

---

7. Defendants attempt to portray Flowers as a government agent. Although Flowers had once acted as a police informant in Tennessee, the evidence was that in the instant case he was acting solely as a private citizen. *Taylor* suggests that the defense of entrapment is not available to one who is induced by a private person to commit a crime; however, the entrapment statute itself seems to include induce-

ments by all persons directed by or acting in cooperation with the police.

8. Prior to their arrival in Utah, Flowers had never met defendants.

9. Supra, footnote 2.

10. *State v. Hansen*, Utah, 588 P.2d 164 (1978); see also *State v. Taylor*, supra, footnote 5.

Q. [Defense attorney]: Did Mr. Flowers ever make any representations? What representations did Mr. Flowers make?

A. One that he couldn't support us. He had four kids and a wife and we couldn't be staying there.

Q. How did it lead up from that to the commission of the offense?

\* \* \* \* \* \*

A. To make money for one for me to get back, and two, to help him with his pain with his ribs, because the doctor wasn't giving him the correct drug to kill the pain.

Defendant also testified as follows:

Q. Why did that induce you into the commission of the offense?

A. The pain I didn't care about. I wanted to get back to California where I belonged, because things didn't turn out the way they were supposed to.

■ We deem the foregoing proffer to be wholly unsupportive of any inducement on the part of Flowers, and given the testimony of Flowers, Hansen, and Gillespie to the effect that Flowers never suggested that defendants commit a burglary, there is little likelihood that the above testimony would have had a substantial influence on the jury in bringing about a different verdict. We may not interfere with a jury verdict unless upon review of the entire record, there emerges error of sufficient gravity to indicate that a defendant's rights were prejudiced in a substantial manner. There must be a reasonable probability there would have been a result more favorable to defendant, in the absence of error.[11] Such a situation is not present in the instant case.

The convictions and judgments are hereby affirmed.

CROCKETT, C. J., and MAUGHAN, WILKINS, and STEWART, JJ., concur.

---

11. *State v. Simmons*, Utah, 573 P.2d 341 (1977); see also U.C.A., 1953, 77–42–1, Rule 5, U.R.E., and Rule 61, U.R.C.P.