2000 UT 8

STATE of Utah, Plaintiff and Appellee,

v.

Anthony C. COLWELL, Defendant and Appellant.

No. 981448.

Supreme Court of Utah.

Jan. 11, 2000.

Jan Graham, Att'y Gen., Marian Decker, Asst. Att'y Gen., Salt Lake City, Gary Heward, Ogden, for plaintiff.

Ronald J. Yengich, Vanessa Ramos–Smith, Salt Lake City, for defendant.

HOWE, Chief Justice:

## INTRODUCTION

¶ 1 Defendant Anthony C. Colwell was found guilty by a jury of attempted aggravated murder and possession of a firearm by a parolee. He now appeals his conviction alleging numerous prejudicial errors and that the evidence adduced at trial does not support his conviction.

## FACTS

¶ 2 On the evening of October 26, 1996, Danielle Bennion was pulled over by Trooper Donald Sagendorf in downtown Ogden, Utah, for an expired vehicle registration and a

damaged headlight. Defendant Anthony C. Colwell was a passenger in the front seat, and David Chavez was a passenger in the back seat.

¶ 3 During the course of the traffic stop, Sagendorf became concerned for his safety when he observed the defendant make furtive movements in the area of the floor of the passenger's side of the car. He called for back-up, and a short time later Trooper Nelson arrived. Sagendorf informed Nelson of his safety concerns and asked him to stand by while he finished the traffic stop.

¶ 4 Sagendorf approached Chavez, asked him to exit the car, and then checked the area under the seat for weapons. He did not find any in the back seat. While Nelson frisked Chavez, Sagendorf heard a metallic sound from the car. The defendant was still sitting in the car. Concerned for his safety, Sagendorf cautiously approached the front passenger area to speak with him. Sagendorf saw the defendant's right hand tucked into the left pocket of his knee-length stadium jacket. Sagendorf's concern heightened, and he requested the defendant to show him his hands. The defendant ignored the request, staring straight ahead of him.

¶ 5 Sagendorf attempted to repeat his request when the defendant suddenly jerked, pulling his right hand from underneath the coat, thrusting a handgun up toward Sagendorf. The trooper immediately tucked in against the car, drew his weapon, and fired at the defendant. Sagendorf moved to the right rear corner of the car, and the defendant moved left across the front seat. Bennion ran screaming from the car. Sagendorf fired again through the rear window as the defendant moved toward the open driver's door. Sagendorf stopped firing only when defendant stopped moving. During the entire incident, Sagendorf believed that the defendant was firing at him, trying to kill him.

¶ 6 Nelson then moved around to the driver's side of the vehicle and saw the defendant lying across the front seat with his hand over his head and his face toward the

dashboard. After firing two rounds and not seeing any movement from the defendant, Nelson looked into the car with a flashlight and saw a pistol by the gas pedal twelve to eighteen inches from the defendant's hand. After watching the defendant a few moments and warning him to stay still, Nelson reached into the car for the handgun. The retrieved handgun was a loaded Beretta model 92 with a round in the chamber. The gun did not appear to have been fired, and the live round, which Nelson removed from the gun, had a dimple consistent with being struck by the firing pin.

¶ 7 The defendant was taken to a hospital for treatment of six gunshot wounds and then charged with attempted aggravated murder, a first degree felony,[1] pursuant to Utah Code Ann. § 76-5-202(1)(k), and possession of a weapon by a parolee, a second degree felony pursuant to Utah Code Ann. § 76-10-503.[2]

¶ 8 James Gaskill, a crime scene investigator for the Weber County Sheriff's office, examined the defendant's gun to see if it functioned properly. He found the gun to be in working order and mechanically sound. He was able to duplicate the dimpling on the bullet by placing six layers of tissue between the hammer and the firing pin, thereby impeding the full force of the hammer from hitting the firing pin. This caused a dimple in the round without it being fired. Gaskill noted at trial that the dimpling caused by the tissue could similarly be imposed by a piece of clothing.

¶ 9 The jury found the defendant guilty on both charges. The trial court sentenced him to five years to life for the attempted aggravated murder, with a one-year term to run consecutively based on the use of a firearm in the commission of the crime, and to a concurrent one- to fifteen-year term for the possession of a firearm by a parolee.

¶ 10 The defendant moved for an arrest of judgment and for a new trial alleging numerous prejudicial errors and that the evi-

---

1. Utah Code Ann. § 76-4-102(1) (1953) makes criminal attempt to commit a capital felony a first degree felony.

2. Utah Code Ann. § 76-10-503(2)(b) (1953) makes possession of a weapon by a parolee a second degree felony.

dence presented at trial did not support the verdict. The motions were denied, and the defendant appeals.

## STANDARD OF REVIEW

¶ 11 When reviewing any challenge to a trial court's denial of arrest of judgment, we review the evidence and all reasonable inferences that may fairly be drawn therefrom in the light most favorable to the jury verdict. We will sustain the trial court's decision unless the jury verdict is so inconclusive or so inherently improbable as to an element of the crime that all reasonable minds must entertain a reasonable doubt. *See State v. Workman,* 852 P.2d 981, 984 (Utah 1993); *State v. Petree,* 659 P.2d 443, 444 (Utah 1983).

¶ 12 When reviewing a trial court's denial of a motion for a new trial, we will not reverse "absent a clear abuse of discretion by the trial court." *State v. Harmon,* 956 P.2d 262, 265–66 (Utah 1998); *State v. Thomas,* 830 P.2d 243, 245 (Utah 1992).

## ANALYSIS

¶ 13 The defendant raises numerous alleged prejudicial errors on appeal. We will consider each error below.

## I. PEREMPTORY CHALLENGE

¶ 14 The defendant first asserts that the trial court abused its discretion in permitting the prosecutor to exercise a peremptory challenge to remove the only African–American member of the panel of prospective jurors. When the challenge was made, defense counsel objected, relying on *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Under *Batson,* parties in a criminal action may not discriminate against potential jurors by exercising peremptory challenges solely on the basis of race. *Id.* at 88, 106 S.Ct. 1712; *see also J.E.B. v. Alabama,* 511 U.S. 127, 154, 114 S.Ct. 1419, 1430, 128 L.Ed.2d 89 (1994) (extending *Batson* rule to include gender).

¶ 15 Juror number sixteen ("Juror 16") was the only African–American on the jury venire, and the defendant is Hispanic.

During voir dire, Juror 16 indicated she had a difficult time hearing the trial judge and the attorneys. She also admitted that she did not wear a hearing aid. When inquiring about her work and family life, the judge had to ask his questions twice before he received the answers he requested. The prosecutor exercised his peremptory challenge and struck her from the venire, stating she was "quite elderly [and] has difficulty hearing."

¶ 16 The defendant challenged the trial court's ruling at trial and, when denied by the court, again after trial on a motion for a new trial and arrest of judgment on the ground that the prosecutor's peremptory challenge had been racially motivated. Following a hearing on the matter, the trial court denied the motion:

> A peremptory challenge was properly exercised in excusing Juror No. 16. Defendant did not establish a prima facie case of racial discrimination. Juror No. 16 is African American. Defendant is Hispanic. Two additional jurors of minority status were not stricken by the prosecution and eventually served on the jury. After examining all relevant circumstances, no necessary inference of purposeful discrimination was shown. The state explained legitimate race-neutral reasons for its challenge.

¶ 17 As we have recognized before:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination.

*State v. Higginbotham,* 917 P.2d 545, 547 (Utah 1996) (quoting *Purkett v. Elem,* 514 U.S. 765, 767 & 768, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834 (1995) (per curiam)); *accord State v. Cantu,* 778 P.2d 517, 518 (Utah 1989) (*Cantu II* ). We examine each of these steps in turn.

¶ 18 The challenging party must first make out the prima facie case by presenting facts adequate to raise an inference of improper discrimination. *See State v. Cantu,* 750 P.2d 591, 595 (Utah 1988) (*Cantu I* ). The mere fact that the subject of the peremptory strike is a minority member does not establish a prima facie case. *See id.* The opponent to the peremptory challenge must establish some record beyond mere numbers to establish a prima facie case of purposeful discrimination under *Batson. See State v. Alvarez,* 872 P.2d 450, 457 (Utah 1994). However, in the instant case, the prosecutor waived the issue of whether a prima facie case was established when he failed to contest its sufficiency and instead provided a rebuttal explanation for the challenge. *See Higginbotham,* 917 P.2d at 548. We will therefore conduct the remainder of the *Batson* review to determine if the trial court erred in sustaining the peremptory challenge.

¶ 19 *Batson*'s second step requires the proponent of the peremptory challenge, the prosecutor in this case, to come forward with a race-neutral explanation for the challenge. Unlike *Cantu II,* where the prosecutor admitted utilizing his peremptory challenge in anger based on the defendant's insistence to include minority members on the panel, the prosecutor in this case used his challenge because of the juror's inability to hear or understand the proceedings.[3] The challenge in this case is facially valid because "discriminatory intent is [not] inherent" in the prosecutor's explanation. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769.

¶ 20 *Batson*'s third and final step:

requires the trial court to decide whether the opponent of the peremptory challenge has proved purposeful racial discrimination. This determination generally turns on the credibility of the proponent of the strike and will not be set aside unless it is clearly erroneous. To show clear error, the appellant must marshal all of the evidence in support of the trial court's finding and then demonstrate that the evidence,

including all reasonable inferences drawn therefrom, is insufficient to support the findings against an attack.

*Higginbotham,* 917 P.2d at 548 (citations omitted).

¶ 21 The defendant notes that Juror 16 affirmatively responded when the trial court asked her if she felt her hearing was good enough to follow the proceedings if she was situated close to the witnesses. Additionally, he points out that Juror 16 was able to respond to several questions from the court without perceived difficulty. He contends the trial court erred in sustaining the peremptory challenge without further inquiry to dispel any discriminatory intent behind the prosecutor's challenge.

¶ 22 We have previously held that a proponent's reason given to justify a peremptory challenge must be " '(1) neutral, (2) related to the case being tried, (3) clear and reasonably specific, and (4) legitimate.' " *Higginbotham,* 917 P.2d at 548 (quoting *Cantu II,* 778 P.2d at 518). The explanation given "need not rise to the level justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97, 106 S.Ct. 1712; *accord Purkett,* 514 U.S. at 768–69, 115 S.Ct. 1769. The trial court found the reason given to be neutral and legitimate. The reason given was clear and specific as to the juror's hearing capacity, which would have affected the case to be tried.

¶ 23 The defendant does not marshal the evidence in support of the race-neutral explanation given by the prosecutor. In reviewing the record, we find no reasonable inferences drawn from the evidence to show error in the trial court's decision to sustain the peremptory challenge. There is nothing in the record suggesting that prejudice against any minority group was implicated. The trial court was involved in the voir dire and observed Juror 16's difficulty in hearing. In addition, two additional jurors of minority status were not stricken by the prosecution and subsequently served on the jury.

---

3. Specifically, the juror raised her hand when asked if she had difficulty in hearing the court. In addition, during voir dire the trial court had to inquire about her employment three times for clarity.

¶ 24 In sum, the defendant fails to establish an abuse of discretion in the trial court's determination of the race-neutral explanation for the challenge. We therefore affirm the trial court's finding that the State successfully rebutted the accusation of purposeful discrimination in exercising its peremptory challenge.

## II. EVIDENCE OF OFFICER–ASSISTED SUICIDE

¶ 25 The defendant's second claim of error challenges the trial court's ruling excluding the testimony of Trooper Sagendorf concerning his knowledge of "officer-assisted suicide." The defendant sought to elicit Sagendorf's testimony as to whether he had ever heard of people pulling guns on police officers in an attempt to commit suicide. The defendant argued that the testimony was relevant because one of the issues at trial was whether his intent was to kill Sagendorf or to commit suicide when he raised his gun. The trial court excluded this testimony on the basis that it was too remote to the case and therefore irrelevant.

¶ 26 When deciding the relevance of testimony and evidence at a trial, a trial court is generally accorded broad discretion. *See Franklin v. Stevenson,* 987 P.2d 22 (Utah 1999); *State v. Real Property at 633 East 640 North,* 942 P.2d 925, 929 (Utah 1997); *State v. Stevenson,* 884 P.2d 1287, 1290 (Utah Ct.App.1994). In circumstances where evidence should have been admitted, it is reviewed for harmless error. If it is reasonably likely a different outcome would result with the introduction of the evidence and confidence in the verdict is undermined, then exclusion is harmful. *See State v. Thomas,* 974 P.2d 269, 276 (Utah 1999).

¶ 27 Under Utah Rule of Evidence 401, any evidence that is slightly probative in value is relevant. *See State v. Jaeger,* 973 P.2d 404, 407 (Utah 1999). "Relevant evidence" means evidence that has any tendency to prove or disprove the existence of any material fact. *Id.* at 406–07; *State v. Peterson,* 560 P.2d 1387, 1391 (Utah 1977).

¶ 28 The trial court did not abuse its discretion in refusing to allow Sagendorf to answer the question. The defense asked whether Sagendorf had "ever heard of people—in your experience as a trooper—who have acted in such a way so that they will be—actually be killed by a highway patrolman?" Sagendorf's knowledge of "officer-assisted suicide" is not relevant to the defendant's state of mind at the time of the offense. Whether Sagendorf had knowledge of other people provoking police officers to shoot them does not shed light on the defendant's intent or state of mind at the time of the offense.

¶ 29 Furthermore, the defendant was allowed to present his theory of "officer-assisted suicide" by other means. He testified that he pulled the gun out in a manner designed to provoke Sagendorf into shooting him. In addition, Bennion testified that the defendant had earlier mentioned his desire to commit suicide. Chavez testified that when the car was pulled over, the defendant stated: "[T]hey are not going to take me alive." Where evidence is excluded by the trial court and the substance of such evidence is later admitted through some other means, any error which may have resulted is cured. *See State v. Stephens,* 667 P.2d 586, 588 (Utah 1983); *State v. Salmon,* 612 P.2d 366 (Utah 1980); *State v. Sorensen,* 617 P.2d 333, 337–38 (Utah 1980).

## III. QUESTIONS CONCERNING PRIOR CONVICTION ON CROSS–EXAMINATION

¶ 30 As a third claim of error, the defendant contends that the prosecutor improperly cross-examined him about the details of a prior felony conviction. He asserts that the trial court erred in denying a motion for a new trial after the prosecutor inquired into the nature of his prior conviction.

¶ 31 Defendant testified in his own behalf and acknowledged his prior convictions for riot and theft, both third degree felonies. When questioned about the prior convictions, defense counsel cautiously limited the examination of the prior convictions to the nature of the crime, date of conviction, and punishment, pursuant to guidance given in *State v.*

**184**

*Tucker,* 800 P.2d 819 (Utah Ct.App.1990),[4] and Utah Rule of Evidence 609. On cross-examination, the prosecutor inquired into the nature and details of the defendant's prior convictions. Defense objected, and the objection to the line of questioning was sustained. In addition, as in *Tucker,* the trial court immediately thereafter gave the jury a curative instruction to disregard the prosecutor's cross-examination questions and any implication therein. *See Tucker,* 800 P.2d at 823.

¶ 32 The State argues that this instance is not governed solely by Utah Rule of Evidence 609(a) (allowing evidence of prior convictions for impeachment). The State asserts that exploration into the underlying facts is permissible for broader substantive purposes governed by Utah Rule of Evidence 404(b). Rule 404(b) provides for the admission of prior crimes to show evidence of something other than a pertinent character trait of the accused. The State contends that because the defendant denied that he intended to kill Sagendorf, he brought his intent into issue. The State argues therefore that evidence showing the defendant had previously shot someone was admissible as probative of his intent at the time the defendant drew his gun on Sagendorf.

¶ 33 We do not agree that the details of the defendant's prior convictions are relevant to his state of mind at the time of the traffic stop. When impeaching a defendant, it is permissible to inquire into the fact and nature of the prior conviction, but not the details or circumstances surrounding the event, absent unusual circumstances. *See State v. Williams,* 656 P.2d 450, 453 (Utah 1982). Inquiry into the "nature" of prior convictions is limited due to the prejudicial effect it may have on the jury. "[I]nquiry into the details of prior convictions [has] been found to be so prejudicial as to amount to plain error." *Tucker,* 800 P.2d at 821 (citations omitted). However, courts will not find plain error if the defendant explores the details of his prior convictions on direct examination or attempts to explain away the crime. *See id.* at 822. Thus, whether the

prosecutor erred in inquiring into the defendant's prior riot conviction is dependant upon whether the "defendant opened the door" to the prosecutor's inquiry by his own testimony.

¶ 34 Rule 609(a) provides that evidence of prior convictions may be used to impeach a testifying defendant's credibility as a witness subject to certain limitations. The defendant is subject to cross-examination only to test his veracity and credibility, "not 'merely to prejudice the jury against the defendant.'" *Tucker,* 800 P.2d at 822 (quoting *United States v. Pennix,* 313 F.2d 524, 528 (4th Cir.1963)). These limits are placed to ensure a defendant is not convicted for past, rather than present, crimes. *See id.* at 822; *United States v. Wolf,* 561 F.2d 1376, 1381 (10th Cir.1977).

¶ 35 In the instant case, the defendant did not attempt to explain away his crime, nor did he examine the details of his prior convictions. Instead, on direct examination the defendant stated only the nature of the prior crime, the date of conviction, and the punishment received. During cross-examination, the prosecutor attempted to question the defendant about the details surrounding the prior conviction. The State contends that they only objected to one of the two questions and the objection was sustained before an answer was given to the second question. Because no answer was given, the State asserts that no prejudicial evidence was received into evidence or introduced to the jury. The exchange between the prosecutor and the defendant proceeded as follows:

Q: You indicated ... the first crime that you went to the Utah State Prison for was a riot, correct?

A: Yes it was.

Q: The riot involved the use of a gun?

A: Yes, it was.

Q: That riot involved ... you shooting someone?

[Defense]: Objection, your Honor.

¶ 36 The objection was sustained, and the jury was given a curative instruction to disre-

---

4. In *Tucker,* the court of appeals held that a defendant could open the door to a prosecutor's inquiry on cross-examination into the defen-dant's prior convictions. *See Tucker,* 800 P.2d at 822–23.

gard the prosecutor's cross-examination questions and any implication they may have given. In addition, the jury was similarly instructed at the close of the evidence in their final instructions.

¶ 37 Inquiry into the details of prior convictions is not allowed except in the previously stated situations. The prosecutor erred in questioning the defendant about the details of his riot conviction. However, the error was harmless because the questioning was suspended before the defendant could provide details to prejudice the jury, and the jury was given adequate instruction on two separate occasions to disregard the evidence.

¶ 38 The defendant contends that by asking the question, the State "rang the bell" and thereby prejudiced the jury. We agree that the "bell was rung" and it was error for the prosecutor to inquire into the details of the defendant's prior conviction. However, unlike *Tucker*, where the objection was overruled and the prosecutor was allowed to continue questioning, the trial court here sustained the objection and the defendant did not answer the second question. We therefore do not find prejudicial error subject to reversal.

## IV. PROSECUTORIAL MISCONDUCT IN CLOSING REMARKS

¶ 39 Fourth, the defendant asserts that statements made by the prosecutor in closing remarks were improper and constituted prosecutorial misconduct. Whether an improper statement in closing remarks constitutes reversible error depends on (1) whether the remarks call to the attention of jurors matters which they could not properly consider in determining their verdict; and (2) the prejudicial effect of the statement on the defendant's case. *See State v. Emmett*, 839 P.2d 781, 785 (Utah 1992); *State v. Bowman*, 945 P.2d 153, 157 (Utah Ct.App.1997); *State v. Wright*, 893 P.2d 1113, 1118 (Utah Ct.App. 1995). If determined to be harmful, improper statements will require reversal. *See Emmett*, 839 P.2d at 785; *State v. Tillman*, 750 P.2d 546, 555 (Utah 1987). To obtain a reversal, the defendant must show that the prosecutor's remarks were obviously improper and harmful. *See Emmett*, 839 P.2d at 785.

¶ 40 The prosecutor concluded his rebuttal argument by inappropriately inferring, in a jocular tone, that defense counsel arranged it so that the prosecutor's "son would fall off the monkey bars at his elementary school and break his arm" the afternoon before closing remarks. Defense counsel objected to the rebuttal argument. Thereafter the trial court gave a curative instruction emphasizing that the comment made by the prosecution was done in jest and that the prosecution was not seriously attempting to connect defense counsel with his son's mishap.

¶ 41 The comments made by the prosecutor were improper in that they called attention to matters that should not be considered by the jury in reaching their verdict. However, the remarks were made in a joking manner and a cautionary instruction was given by the trial judge to mitigate any prejudicial effect they may have had on the defendant's case. We believe a reasonable jury would not consider the comments made by the prosecutor as evidence when rendering a verdict. We therefore conclude that the comments were made in bad judgment but were not prejudicial as to defeat the mitigating effect of the trial court's curative instruction, and thus do not constitute harmful and reversible error.

## V. EVIDENCE TO SUPPORT THE VERDICT

¶ 42 The defendant next contends that the evidence was insufficient to support the jury's verdict and that the trial court erred in denying his motion for an arrest of judgment. We will not lightly overturn a jury verdict. *See State v. McClain*, 706 P.2d 603, 605 (Utah 1985). A verdict rendered by a jury is overturned only if the evidence presented at trial is so insufficient that reasonable minds could not have reached the verdict. We review the evidence presented at trial in a light most favorable to the verdict. *See id.; Petree*, 659 P.2d at 444; *Workman*, 852 P.2d at 984. When findings of all required elements of the crime can be reasonably made from the evidence, includ-

ing the reasonable inferences that can be drawn from it, we stop our inquiry and sustain the verdict. *See McClain*, 706 P.2d at 605; *State v. Eaton*, 701 P.2d 496, 498 (Utah 1985); *State v. McCardell*, 652 P.2d 942, 945 (Utah 1982). " '[I]ntent to commit [a crime] may be found from proof of facts from which it reasonably could be believed that such was the defendant's intent.' " *McClain*, 706 P.2d at 605 (quoting *State v. Kazda*, 15 Utah 2d 313, 317, 392 P.2d 486, 488 (1964)). It is also the responsibility of the jury to evaluate the evidence and give its own weight to the evidence in rendering its verdict.

¶ 43 The defendant asserts that the evidence presented during trial did not establish beyond a reasonable doubt that he had the intent to kill the officer. We have held that intent to commit a crime " 'may be inferred from the actions of the defendant or from surrounding circumstances.' " *Id.* (quoting *State v. Murphy*, 674 P.2d 1220, 1223 (Utah 1983)). The evidence reveals the following: Bennion testified that the defendant earlier in the evening had threatened that "if someone messes with us tonight[,] they're going down"; Chavez testified that the defendant threatened to "shoot the cop" as soon as he saw the lights of Sagendorf's patrol vehicle, and that he heard the defendant cock the Beretta before Chavez was removed from the vehicle; ballistics evidence indicated that the bullet retrieved from the defendant's gun appeared consistent with an unsuccessful attempt to shoot the weapon; and the defendant testified that he wanted to die that night. Evidence supporting a theory of attempted murder or an alternate theory of suicide and any inferences to be drawn therefrom were adequately presented at trial. It was the jury's responsibility to weigh all the evidence and the testimony of each witness. We therefore find it reasonable that a jury could have decided that the defendant intended to kill Sagendorf that night and thus render a verdict of attempted murder.

## VI. NUMEROUS ERRORS AND CONFIDENCE IN THE VERDICT

¶ 44 Finally, the defendant argues that even if the errors committed during the course of his trial were harmless individually, they were cumulatively harmful. Under the cumulative error doctrine, we will reverse only if " 'the cumulative effect of the several errors undermines our confidence ... that a fair trial was had.' " *State v. Harmon*, 956 P.2d 262, 277 (Utah 1998) (quoting *State v. Dunn*, 850 P.2d 1201, 1229 (Utah 1993) (internal quotation omitted)); *accord State v. Cardall*, 982 P.2d 79, 85 (Utah 1999) (citing *State v. Ellis*, 748 P.2d 188, 191 (Utah 1987); *State v. Rammel*, 721 P.2d 498, 501–02 (Utah 1986)). In assessing a claim of cumulative error, we consider all the identified errors, as well as any errors we assume may have occurred. All the errors the defendant has raised have been reviewed. The errors were properly cured at trial and did not prejudicially influence the jury against the defendant. Therefore, the cumulative errors do not undermine our confidence that the defendant received a fair trial.

¶ 45 Affirmed.

¶ 46 Associate Chief Justice DURHAM and Justice RUSSON concur in Chief Justice HOWE's opinion.

¶ 47 Justice ZIMMERMAN concurs in the result.

STEWART, Justice, concurring in the result:

¶ 48 I concur in the majority opinion with one exception. The Court holds that the trial court did not abuse its discretion in refusing to allow Officer Sagendorf to testify concerning his knowledge of "officer-assisted suicide." The majority states that "[w]hether Sagendorf had knowledge of other people provoking police officers to shoot them does not shed light on defendant's intent or state of mind at the time of the offense." That, of course, is literally true, but the question was clearly foundational and the line of inquiry it might have opened up was clearly relevant to the defendant's defense. An affirmative answer might well have led to information bearing on defendant's state of mind. If this Court, and for that matter trial courts, base relevancy rulings on such a shortsighted, literalistic view of the questions put by

counsel, the examination of witnesses will be severely and improperly (and sometimes unconstitutionally) restricted.

¶ 49  In my view, the failure of the trial court to allow the question was, however, clearly harmless under the circumstances.