2007 UT App 268

**STATE of Utah, Plaintiff and Appellee,**

v.

**Renae Reid BOLSON, Defendant and Appellant.**

No. 20051052–CA.

Court of Appeals of Utah.

Aug. 2, 2007.

Jennifer K. Gowans, Provo, for Appellant.

Mark L. Shurtleff, Atty. Gen., and Brett J. Delporto, Asst. Atty. Gen., Salt Lake City, for Appellee.

Before BENCH, P.J., BILLINGS, and DAVIS, JJ.

## OPINION

BENCH, Presiding Judge:

¶ 1 Defendant Renae Reid Bolson appeals from her convictions on four counts of securities fraud, second degree felonies, *see* Utah Code Ann. § 61–1–1 (2006), one count of selling an unregistered security, a third degree felony, *see* Utah Code Ann. § 61–1–7 (2006), and one count of pattern of unlawful activity, a second degree felony, *see* Utah Code Ann. § 76–10–1603.5 (2003). Defendant's challenge to the jury instruction on willfulness fails because defense counsel was actively involved in the creation of the instruction and thereafter affirmatively represented to the trial court that Defendant had no objection. Further, Defendant's various arguments regarding the sufficiency of the evidence, initially addressed by the trial court in response to Defendant's Motion to Arrest Judgment, fail because Defendant has not demonstrated that the evidence on the record is so inconclusive or inherently improbable that a reasonable jury must have entertained reasonable doubt as to Defendant's guilt. We therefore affirm.

## BACKGROUND

¶ 2 In 1999, Paul Stewart began an investment scheme (the Program). Potential investors were encouraged to deposit money, usually proceeds achieved by taking out first or second mortgages on properties they owned, into the Program's escrow account. In return, the Program would pay the investors' new mortgage payments and pay the investors an unusually high percentage of interest annually. After the agreed upon time frame, usually between two and four years, investors would be able to retrieve their full investment from the escrow account. Investors were provided with written guarantees from a title guaranty company stating that the funds placed in the escrow account were held in trust and would be accessible at any time. Stewart told potential investors that the funds would not be dissipated in any way and would only serve as collateral in deals about which Stewart did not disclose many details.

¶ 3 Defendant met Stewart at Main Street Financial (MSF), the brokerage firm where Defendant worked as an office manager. Stewart conducted some of the Program's business through MSF, though he was not officially affiliated with the brokerage firm. Defendant watched Stewart conduct business for the Program and eventually volunteered to help Stewart with some clerical work, such as mailing checks to the Program investors. When she saw what investors were being paid, Defendant also invested in the Program. After joining the Program as an investor, Defendant enthusiastically encouraged others to invest in the Program and, according to multiple victims of the fraud, became the contact person for information about the Program.

¶ 4 In reality, the Program was merely an elaborate Ponzi scheme, defined as "[a] fraudulent investment scheme in which money contributed by later investors generates artificially high dividends for the original investors, whose example attracts even larger investments." Black's Law Dictionary 1180 (7th ed.1999). The money collected from these later investors was never safe, as claimed by Defendant and Stewart, because it was used by the Program principals to make the payments owed to the original investors. In all, upwards of three hundred

people lost millions of dollars through the Program.

¶ 5 Tom Barberi, an early investor, sold his home through the Program in November 1999. Prior to the sale, Barberi received a letter from Defendant on MSF letterhead in which Defendant vouched for Stewart as a financially sound and creditworthy investment banker. The letter also named Defendant as a contact person for the Program. Defendant, on behalf of Stewart, later invited Barberi to extend the time of his investment for an up-front cash bonus, which Barberi accepted. It was Defendant, not Stewart, who handled that transaction for Barberi. When Barberi's checks started to bounce or were late, Defendant repeatedly gave vague and evasive excuses. Barberi stopped receiving payments completely about a year after he joined the Program.

¶ 6 Michelle Jacobsen, another 1999 investor, made multiple investments in the Program. As with other investors, Defendant told Jacobsen not to worry about the high mortgage payments because the Program would be paying them. Jacobsen received checks from the Program starting in January of 2000, which she picked up from Defendant at MSF. While the first check was on time, successive checks were received later and later. Ultimately, the checks started bouncing. Although the bounced checks were sometimes replaced with guaranteed funds, Jacobsen became increasingly worried because she could not personally afford the mortgages she had taken out. Jacobsen often sought out Defendant for assurances and answers.

¶ 7 By late 2000 or early 2001, the checks sent out by Defendant were chronically late and often bounced. Even as the Program began to collapse and payments to investors ceased or checks bounced, Defendant continued to encourage potential investors to invest without disclosing the problems the Program was experiencing. Defendant provided upset investors with various excuses as to why the payments were not being timely made and assured them that the payments were forthcoming and that the Program would pay any late fees. These forthcoming payments were rarely made. When the Program completely stopped making payments sometime in 2001, Defendant continued to tell angry investors that there were just a few glitches in the Program and that their investments were safe.

¶ 8 Defendant was convicted by a jury on four counts of securities fraud. All four counts corresponded to victims who joined the Program late in 2000 or during the first months of 2001. These victims all testified that Defendant encouraged them to join and used the same descriptions of the so-called risk free, "too good to be true" investment that Defendant had used to entice earlier investors such as Barberi and Jacobsen. While encouraging these later investors to join the Program, Defendant was aware of the payment problems some of the earlier investors were having. Defendant did not disclose the payment problems to these later investors, even when she knew of the problems.

¶ 9 After the trial, Defendant filed a Motion to Arrest Judgment with the trial court, essentially claiming that the evidence presented at trial was insufficient to support her convictions. Defendant now appeals the trial court's denial of her Motion to Arrest Judgment.

## ISSUE AND STANDARD OF REVIEW

¶ 10 In determining whether a trial court correctly granted or denied a motion for arrest of judgment, we apply the same standard used in deciding sufficiency of the evidence claims. *See State v. Workman,* 852 P.2d 981, 984 (Utah 1993). Thus, "a trial court may arrest a jury verdict when the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element." *Id.*

## ANALYSIS

### I. Jury Instruction

¶ 11 Defendant challenges the trial court's instruction to the jury on "willfully" in the context of committing securities fraud.

Because she did not object to the instruction below, Defendant asks us to review the jury instruction for "manifest injustice." Utah R.Crim. P. 19(e). However, when a defendant not only fails to object to an instruction, but affirmatively agrees to it, appellate courts may not review the propriety of the instruction, even under the manifest injustice doctrine. *See State v. Hamilton*, 2003 UT 22, ¶ 54, 70 P.3d 111 ("[I]f counsel, either by statement or act, affirmatively represented to the court that he or she had no objection to the jury instruction, we will not review the instruction under the manifest injustice exception."); *see also State v. Geukgeuzian*, 2004 UT 16, ¶ 9, 86 P.3d 742 (" '[A] party cannot take advantage of an error committed at trial when that party led the trial court into committing the error.' " (quoting *State v. Anderson*, 929 P.2d 1107, 1109 (Utah 1996))).

¶ 12 The Utah Supreme Court has identified various ways by which defendants may disqualify themselves from appellate review of a jury instruction for manifest injustice. *See Geukgeuzian*, 2004 UT 16 at ¶ 10, 86 P.3d 742. The supreme court's inexhaustive list includes counsel confirming on the record that the defense has no objection to the instructions, *see Hamilton*, 2003 UT 22 at ¶ 55, 70 P.3d 111; counsel failing to object when specifically asked for objections by the trial court, *see Anderson*, 929 P.2d at 1108–09; and counsel's "active[ ] represent[ation] to the court that [counsel] ha[s] read the instruction and ha[s] no objection to it." *State v. Medina*, 738 P.2d 1021, 1023 (Utah 1987).

¶ 13 Here, Defendant's trial counsel did not simply remain silent when the jury instructions were given. In her appellate brief, Defendant concedes that trial counsel stipulated to the language of the jury instruction now challenged. Such a stipulation before the trial court qualifies as the type of affirmative representation that prevents a defendant from receiving appellate review of the jury instruction, even under the manifest injustice doctrine. *See id.* We therefore decline to address the merits of Defendant's claim that the instruction in question was given in error.

## II. Sufficiency of the Evidence

### A. Securities Fraud

■ ¶ 14 Defendant argues that the evidence at trial was insufficient to support the jury verdict of guilty on four counts of securities fraud and that the trial court erred in denying her Motion to Arrest Judgment. An appellate court "will not lightly overturn a jury verdict." *State v. Colwell*, 2000 UT 8, ¶ 42, 994 P.2d 177; *see also State v. McClain*, 706 P.2d 603, 605 (Utah 1985). "A verdict rendered by a jury is overturned only if the evidence presented at trial is so insufficient that reasonable minds could not have reached the verdict." *Colwell*, 2000 UT 8 at ¶ 42, 994 P.2d 177; *see also State v. Workman*, 852 P.2d 981, 984 (Utah 1993). "When findings of all required elements of the crime can be reasonably made from the evidence, including the reasonable inferences that can be drawn from it, we stop our inquiry and sustain the verdict." *Colwell*, 2000 UT 8 at ¶ 42, 994 P.2d 177.

■ ¶ 15 Here, the jury instructions outlined the elements of securities fraud and required the State to prove that Defendant:

(1) directly or indirectly, (2) willfully, (3) in connection with the offer or sale of a security, (4) to [the various victims named in connection with each count], (5) made an untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements made in light of the circumstances under which they were made, not misleading or engaged in an act, a practice, or course of business which operated or would operate as a fraud or deceit upon investors, (6) at the time the property, or money, or the thing unlawfully obtained or sought to be obtained was worth more than $100,000.

Defendant's appeal centers on whether her statements or omissions were willful, rather than merely negligent or foolish as Defendant claims. Defendant links her appellate argument on sufficiency of the evidence with her arguments regarding the propriety of the jury instruction defining "willfully," hoping that we will reverse her convictions based on that issue. As noted above, we cannot address the merits of her challenge to the

instruction. We will therefore briefly discuss the sufficiency of the evidence in light of the instruction given.

¶ 16 The four counts of securities fraud on which Defendant was convicted all pertain to investors who entered the Program late in 2000 or in the first quarter of 2001. Although Defendant was not convicted on counts relating to investors who entered the Program earlier than this, the jury was allowed to consider the evidence presented thereon because it pertained to Defendant's overall involvement with and knowledge of the Program. The trial court determined that this evidence was relevant to whether Defendant willfully omitted material facts when explaining and promoting the Program to later investors.

¶ 17 The evidence reflects that Michelle Jacobsen, who first invested in the Program late in 1999, was having trouble with increasingly late and bouncing checks early in 2000. Defendant, who handled the checks, knew of these problems. Tom Barberi was having similar problems with late and bouncing checks. Again, there is evidence to suggest that Defendant knew of Barberi's problems and that Defendant was the Program's contact person for investors who were having problems with their payments.

¶ 18 The jury could have reasonably believed that Defendant knew of these payment problems at the times she was informing the later investors about the Program. The jury could have also reasonably believed that, despite knowing of the payment problems and without disclosing her knowledge of the problems, Defendant assured later investors that there was no risk to their initial investments, that the Program would pay out unusually high interest rates, and that the Program would make the costly mortgage payments each month. Such omissions would satisfy the "willfully" element of securities fraud under the stipulated jury instruction. Defendant has not challenged the sufficiency of the evidence with regard to the other elements of securities fraud, and the

record contains evidence on which a jury could reasonably believe that all the elements of each respective count of securities fraud were proven beyond a reasonable doubt. We therefore affirm the trial court's denial of Defendant's Motion to Arrest Judgment and her convictions on four counts of securities fraud.[1]

### B. Selling an Unregistered Security

■ ¶ 19 Defendant also claims that the State failed to produce sufficient evidence to support her conviction for selling an unregistered security. Specifically, Defendant argues that the State did not prove beyond a reasonable doubt that she had the intent and ability to complete the transactions in which she was involved. "It is unlawful for any person to offer or sell any security in [Utah] unless it is registered." Utah Code Ann. § 61–1–7 (2006). The Utah Code defines "offer to sell" as "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value." Utah Code Ann. § 61–1–13(1)(v)(ii) (2006).

¶ 20 Here, Defendant fails to present a tenable legal argument for her position that the lack of proof of her intent and ability to complete transactions on behalf of the Program precludes a conviction on this count. The statute does not contemplate a defendant's ability or authority to actually complete these transactions, and Defendant has not presented us with any persuasive analysis that would require the addition of these elements. Defendant does not otherwise challenge the sufficiency of the evidence relating to the actual elements of selling an unregistered security, as defined by the statute and the unchallenged jury instructions.

### CONCLUSION

¶ 21 Defendant's challenge to the jury instruction defining "willfully" fails because she affirmatively stipulated to the instruction at trial. The evidence before the jury relating

---

1. Defendant also challenges her conviction for engaging in a pattern of unlawful activity. *See* Utah Code Ann. § 76–10–1603.5(1) (2003). She concedes that her claims on this issue depend on our first reversing her convictions on the multi-

ple counts of securities fraud. Based on our affirmance of those convictions, we also affirm her conviction for engaging in a pattern of unlawful activity.

to the securities fraud convictions was sufficient in that the evidence and the inferences that could be reasonably drawn therefrom were not "so inconclusive or so inherently improbable" that the jury must have had a reasonable doubt. *State v. Workman,* 852 P.2d 981, 984 (Utah 1993). Defendant has failed to persuade us that the State was required to produce evidence on Defendant's intent and ability to complete transactions in order to obtain a conviction for selling an unregistered security.

¶ 22 For the foregoing reasons, we affirm Defendant's convictions.

¶ 23 WE CONCUR: JUDITH M. BILLINGS and JAMES Z. DAVIS, Judge.