**2016 UT App 138**

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
RICK JIMENEZ,
Appellant.

Memorandum Decision
No. 20140841-CA
Filed June 30, 2016

Third District Court, Salt Lake Department
The Honorable Denise P. Lindberg
No. 131905941

Nathalie S. Skibine and Scott A. Wilson, Attorneys
for Appellant

Sean D. Reyes and Jeanne B. Inouye, Attorneys
for Appellee

JUDGE STEPHEN L. ROTH authored this Memorandum Decision, in which JUDGE MICHELE M. CHRISTIANSEN and SENIOR JUDGE JUDITH M. BILLINGS concurred.[1]

ROTH, Judge:

¶1 Rick Jimenez appeals his conviction for burglary, a second-degree felony, on the ground that the trial court exceeded its discretion by excluding his medical records exhibit. We affirm.

¶2 In December 2012, a woman came home to find that someone had broken into her house in Salt Lake City, Utah.

---

1. Senior Judge Judith M. Billings sat by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 11-201(6).

Plastic insulation had been pushed away from one of the windows, and a garbage can had been placed underneath. The window was high enough off the ground that a person standing on the ground would have to reach up to touch the windowsill, and the position of the garbage can suggested a means of entry. A number of items were missing from the house, including small electronics, watches, clothing, and money. The woman called the police. An officer came to the woman's home, took her statement, and walked through the house without noting anything of particular interest.

¶3     The next day, the woman noticed "bits" of blood on the end of a pillow, on her bedroom dresser, on her bathroom vanity, on the handle of a blender in the kitchen, and on various items of clothing. She again called the police, who sent a crime scene investigator to take photos, look for fingerprints, and obtain a sample of blood from the blender. The only fingerprint sufficient for comparison did not identify a suspect, and none of the items missing from the house were ever found. But after a delay of about six months, the crime lab completed its analysis of the DNA results from the blood and found that the DNA, when checked against a database, was a match for Jimenez, a resident of Ogden, Utah.

¶4     Police questioned Jimenez about the burglary and advised him that he was a suspect. When an officer showed Jimenez a picture of the victim's home, Jimenez claimed that he had never been there before. When the officer then advised Jimenez that blood found inside the house matched his DNA profile, Jimenez responded that "he didn't understand how that could happen because he was never inside that house." Jimenez was charged with one count of burglary. *See* Utah Code Ann. § 76-6-202 (LexisNexis 2012).

¶5     At trial, the State argued that the DNA results proved Jimenez had entered the house and stolen the items. And for the

first time, Jimenez offered an alternative explanation for the presence of his blood in the house. He claimed that a few days before the burglary, he had traveled from Ogden with a friend (D.L.) to help D.L.'s friend in Salt Lake City. Jimenez and D.L. met D.L.'s girlfriend and another friend at a motel. While they were there, Jimenez walked to the front of the motel and saw a little girl crying. He asked her what was wrong, and she informed him that she needed her medication—Xanax. Jimenez offered to help, and he, D.L., and D.L.'s girlfriend then drove the girl to the house of someone she had identified as a friend, who turned out to be someone Jimenez had grown up with (D.B.). When Jimenez asked D.B. about the girl's medication, D.B. became upset and yelled at Jimenez to "get her out of [the] house." But D.B.'s girlfriend said that she could get the girl's pills and ran across the street into another house, which turned out to be the victim's house. While Jimenez waited for D.B.'s girlfriend to return, two more girls approached him. One of the girls had come out of the victim's house, and the other girl had two dogs. The first girl told Jimenez that "she" (the reference is uncertain) did not "have enough money"—apparently to purchase the medication—and Jimenez came up with $20 and D.L. with another $3. Then one of the dogs, a pit bull, jumped on Jimenez and knocked him down. When he stood up, Jimenez realized that his arm was bleeding. One of the girls went into the victim's house to get him a dishrag. After he used the rag to clean his arm, he returned it to the girl. Jimenez testified that he and D.L. then went back to Ogden.

¶6    Jimenez claimed that he did not recognize the victim's house when the officer first showed it to him during the interview but that he later recognized the address as being near the home of his acquaintance D.B. and realized that the burglary had happened soon after he was there. He surmised that his blood must have gotten into the house via the dishrag.

¶7    Jimenez also asserted that he had health conditions that would have precluded him from climbing onto a garbage can and through a window, as the burglar apparently did. He testified that he has "six herniated disks," "a crushed vertebrae in [his] neck," and "a tor[n] tendon." He testified that he has been treated for these conditions with medication and physical therapy for the past fourteen years.

¶8    Jimenez sought to introduce medical records to corroborate his testimony regarding his physical condition. At trial, the State objected to the admission of the medical records on relevance grounds. The State asserted that the diagnoses in the records were based solely on Jimenez's self-reported injuries and symptoms and pointed out that the most recent report was from January 2012, almost a year before the December 2012 burglary. Because the records were not contemporaneous with the burglary; contained no objective tests, such as x-rays; and contained no medical opinions regarding the effects of Jimenez's condition on his ability to climb onto a garbage can and through a window, the State argued that the records were irrelevant.[2] The trial court agreed, explaining that records dating to nearly a year before the burglary and not containing any objective measures of injury were not relevant to establish Jimenez's condition at the time of the burglary. The court explained that even assuming that portions of the medical records might be relevant and might be admissible if redacted, Jimenez had not provided the court with a redacted version of the medical records in a timely manner and it was too late to do so. The court further concluded that because the records were based on Jimenez's self-reported

---

2. The State alternatively claimed that the records were hearsay and that, under rule 403 of the Utah Rules of Evidence, their probative value was outweighed by their potential to confuse the jury. The trial court rejected these alternative arguments, and in light of our holding, we need not address them further.

symptoms, they were cumulative of his testimony and therefore need not be admitted. Accordingly, the trial court excluded Jimenez's medical records exhibit. The jury convicted Jimenez of the burglary charge, and he now appeals.

¶9     "[W]e review a trial court's decision to admit or exclude specific evidence for an abuse of discretion." *State v. Jones*, 2015 UT 19, ¶ 12, 345 P.3d 1195 (alteration in original) (citation and internal quotation marks omitted). Nevertheless, even "[i]n circumstances where evidence should have been admitted, it is reviewed for harmless error." *State v. Colwell*, 2000 UT 8, ¶ 26, 994 P.2d 177; *see also* Utah R. Crim. P. 30(a) ("Any error, defect, irregularity or variance which does not affect the substantial rights of a party shall be disregarded."). Exclusion of evidence is harmful "[i]f it is reasonably likely a different outcome would result with the introduction of the evidence and confidence in the verdict is undermined." *Colwell*, 2000 UT 8, ¶ 26.

¶10    Jimenez asserts that the medical records were relevant and not needlessly cumulative and that the court should have therefore either admitted them in their entirety or given Jimenez the opportunity to redact them. But even accepting Jimenez's arguments, we ultimately conclude that any error on the part of the trial court was harmless.

¶11    While we do not agree with the trial court that the medical records were irrelevant to Jimenez's impossibility defense,[3] it is unlikely that the admission of the medical records

---

3. "Evidence is relevant if . . . it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Utah R. Evid. 401. Although the evidence of Jimenez's history of medical problems could not have definitively shown whether he was able to climb onto a garbage can and through a window—as

(continued…)

would have resulted in a different verdict. *See id.* The DNA evidence demonstrating the presence of Jimenez's blood in the home provided strong evidence of his guilt. The story he told to explain the presence of the blood was disjointed and implausible. And his complicated story was revealed for the first time at trial, after he had given no hint of this convoluted

---

(…continued)

the medical records were not contemporaneous to the burglary and contained little information regarding how Jimenez's medical problems affected his mobility—they did indicate that he had previously been diagnosed with back and leg pain, a herniated disc, and a tendon disorder (though based largely on his own self-reported history) and that he had been known to walk with a cane. The medical records therefore constituted evidence having a tendency to make Jimenez's ability to climb onto the garbage can and through the window less likely. Accordingly, those records were relevant to Jimenez's defense (though, ultimately, not so probative that their exclusion was prejudicial, *see infra* ¶¶ 11–13). Furthermore, the medical records were not needlessly cumulative of Jimenez's testimony, *see* Utah R. Evid. 403, because they bolstered Jimenez's credibility by indicating that he had previously reported serious back and leg conditions to medical professionals for the purpose of obtaining treatment and had not made his claims of back problems for the first time on the witness stand. *See State v. Worthen*, 2008 UT App 23, ¶ 26, 177 P.3d 664 (indicating that "evidence that exists in more than one form" is not necessarily cumulative because it "may prove to be independently probative at trial" due to the quality of the source or its corroborative value), *aff'd*, 2009 UT 79, 222 P.3d 1144. *See generally* Utah R. Evid. 801(d)(1) (excluding from the definition of hearsay statements consistent with a declarant's testimony "offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying").

sequence of events in response to the officer's revelation during an initial interview that his blood had been found in the victim's house. Rather, he stated only that "he didn't understand how that could happen because he was never inside that house." Moreover, while his story involved a number of participants— Jimenez's friend D.L., D.L.'s girlfriend, another friend of D.L., the little girl who needed medication, Jimenez's own acquaintance D.B. (who lived just across the street from the victim's home), D.B.'s girlfriend, and the two girls with the dogs (at least one of whom had at one point come out of the victim's home itself)[4]—no witness appeared at trial to corroborate any portion of Jimenez's story of the events of that day.

¶12    Moreover, while medical records or testimony strongly supporting Jimenez's assertion that he was physically incapable of climbing onto the garbage can and through the window might have prompted the jury to accept the implausible story of how his blood got into the house, we are unconvinced that the limited evidence contained in the medical records would have been sufficient to do so. Although the records corroborated Jimenez's testimony by demonstrating that he had reported his claimed conditions to medical professionals on several occasions prior to the burglary, other than noting that he used a cane, the records contain no tests or assessments that give any indication of the effect of Jimenez's back condition on his mobility or the potentially alleviating effect of the medications he was receiving. And because the records cover only a six-month period, with the most recent dated nearly a year prior to the burglary, their

---

4. Jimenez's testimony makes it somewhat difficult to distinguish between the various participants, so it is possible that some of these individuals are actually the same person. The fact that fewer people may have been involved in the events related by Jimenez has no effect on our analysis.

ability to substantiate Jimenez's account of his condition at the relevant time was limited.

¶13    Under the circumstances of this case, it would have required highly persuasive evidence that Jimenez was physically incapable of entering the window for his alternative explanation for the presence of his DNA in the victim's house to have raised a reasonable doubt about his guilt in the mind of the jury. The probative value of the medical records was too limited to have accomplished this task. For these reasons, we are not convinced that any error in the trial court's decision to exclude the medical records prejudiced Jimenez. *See Colwell*, 2000 UT 8, ¶ 26.

¶14    We therefore affirm Jimenez's conviction.

_____