STATE of Utah, Plaintiff and Appellee,

v.

Scott BOWMAN, Defendant
and Appellant.

No. 960372–CA.

Court of Appeals of Utah.

Sept. 5, 1997.

**154**

Robin K. Youngberg and Rebecca C. Hyde, Salt Lake Legal Defender Ass'n, Salt Lake City, for Appellant.

Jan Graham, Atty. Gen., Kenneth A. Bronston, Asst. Atty.Gen., Salt Lake City, for Appellee.

Before BENCH, BILLINGS and GREENWOOD, JJ.

BILLINGS, Judge:

Defendant Scott Bowman appeals his convictions for failing to respond to an officer's signal to stop, a third degree felony in violation of Utah Code Ann. § 41–6–13.5 (1995), and for license and registration violations, class C misdemeanors in violation of Utah Code Ann. § 41–1a–1305(5) (1993). We affirm.

## FACTS

At approximately midnight on August 5, 1996, Salt Lake County Deputy Sheriff Ann Cardon observed a motorcyclist run a red light. Deputy Cardon activated her patrol car's overhead lights and siren in pursuit of the fleeing motorcycle, but soon lost sight of it when it ducked down a side street behind a local business. Suspecting the motorcyclist would circle the business and return to the main road, Deputy Cardon positioned her patrol car to block an adjacent street. The motorcyclist came up the street toward her and narrowly avoided an accident with her patrol car as he maneuvered around it and escaped down a sidewalk. Although Deputy Cardon renewed her pursuit, she was unable to keep up with the motorcyclist and he disappeared.

As Deputy Cardon searched the area, she was approached by Kevin Mitchell, defendant's former roommate. Mitchell explained that he had witnessed the chase and could identify the motorcyclist. He supplied the deputy with defendant's name and address. Defendant was talking with a couple of police officers outside his home when Cardon arrived. She immediately identified defendant as the motorcyclist she had pursued earlier that evening. When asked why he ran from the police, defendant responded that he was upset because he had a wife living in Toronto, Canada, who would not let him see his kids. Defendant was arrested and charged with failure to stop for a police officer and for license and registration violations.

During jury selection, the State exercised two of its three peremptory challenges to dismiss an Asian woman, Ms. Dang, and another woman, Ms. Alires, whose racial identity was not conclusively established in the record but who arguably had an Hispanic surname.[1] When defendant asked the State to justify using two of its peremptory strikes to dismiss two-thirds of the minority jurors pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the prosecutor explained he had a concern for Dang's "command of English," and did not think Alires was a minority and believed that Ms. Alires was somehow related to a defendant he was currently prosecuting of the same name. The trial court accepted the prosecutor's explanation and denied defendant's challenge.

At trial, during the State's case-in-chief, officers testified to the explanation defendant gave them as to why he fled and this testimo-

---

1. The State did not dispute defendant's comment that Dang was "of obviously Asian descent." Defendant mistakenly asserts, however, that his description of Alires as a "woman of Hispanic descent" was similarly undisputed by the State. The record clearly shows that the State contested Alires's ethnicity as soon as it had an opportunity to respond to defendant's challenge.

ny was admitted without objection from defendant. When defendant subsequently denied he had been the motorcyclist pursued by Deputy Cardon and contested the reliability of her identification, this testimony was again received on rebuttal for impeachment purposes. Before the jury was instructed and before the parties gave their closing arguments, defendant requested the court to give an instruction limiting consideration of defendant's admissions concerning his flight from police to their impeachment value, claiming the admissions were made in violation of defendant's *Miranda* rights. The trial court found it unnecessary to decide the *Miranda* issue because the statements were admissible for impeachment purposes. However, the trial court denied defendant's request for an instruction limiting the use of this admission to impeachment purposes.

In his closing argument, defense counsel urged the jury to acquit the defendant because the State had failed to produce Mitchell, a key witness. Neither party had called Mitchell to the stand. The prosecutor responded in rebuttal that Mitchell's testimony was not material to the State's case, and commented on defendant's opportunity to produce Mitchell had he wanted the jury to hear from him. Defendant objected.

Defendant was convicted of both counts and now appeals. He claims the trial court committed error when it denied his *Batson* challenge and when it refused to give the limiting instruction he requested. He further alleges that the prosecutor made prejudicial statements in his closing remarks, denying him a fair trial.

## ANALYSIS

### I. *Batson* Challenge

■ First, defendant claims the prosecutor used his peremptory challenges against Dang and Alires in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which prohibits parties in a criminal action from challenging potential jurors based on their race. Under Utah law,

we decide a *Batson* challenge using a three-step analysis:

> "Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step 1), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step 2). If a race-neutral explanation is tendered, the trial court must then decide (step 3) whether the opponent of the strike has proved purposeful racial discrimination."

*State v. Higginbotham*, 917 P.2d 545, 547 (Utah 1996) (quoting *Purkett v. Elem*, 514 U.S. 765, 766–69, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995) (per curiam)). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett*, 514 U.S. at 768, 115 S.Ct. at 1771 (per curiam). The parties agree that the *Batson* issue in this case turns on step three.[2]

■ The third step of the *Batson* analysis "requires the trial court to decide whether the opponent of the peremptory challenge has proved purposeful racial discrimination." *Higginbotham*, 917 P.2d at 548. As this is a question of fact, we will not reverse the decision of the trial court unless it is clearly erroneous. *See State v. Merrill*, 928 P.2d 401, 403 (Utah Ct.App.1996).

■ In making this determination, the trial court must consider whether the proffered, facially valid explanation is " '(1) neutral, (2) related to the case being tried, (3) clear and reasonably specific, and (4) legitimate.' " *State v. Cantu*, 778 P.2d 517, 518 (Utah 1989) (citation omitted) (*Cantu II* ). Defendant contests the legitimacy of the prosecutor's explanation, arguing the explanation given was a pretext for purposeful discrimination. The Utah Supreme Court has identified several factors that bear on the legitimacy of a race-neutral explanation, including:

> (1) alleged group bias not shown to be shared by the juror in question, (2) failure to examine the juror or perfunctory exami-

---

2. The prosecutor waived the issue of whether a prima facie case of discrimination was established by failing to raise it in the trial court and providing an explanation for his use of the challenged peremptory strikes. *See State v. Higginbotham*, 917 P.2d 545, 547 (Utah 1996).

nation assuming neither the trial court nor opposing counsel had questioned the juror, (3) singling the juror out for special questioning designed to evoke a certain response, (4) the prosecutor's reason is unrelated to the facts of the case, and (5) a challenge based on reasons equally applicable to juror[s] who were not challenged.

*Id.* at 518–19 (citation omitted).

In support of his contention that the prosecutor's explanations were pretextual, defendant points out that (1) the prosecutor's explanation for striking Alires is factually incorrect because it contradicts the juror questionnaire answered by Alires, where she stated she had no relatives prosecuted for a crime, (2) the prosecutor's reason for striking Dang is similarly unsupported by the record, and (3) the State failed to conduct any voir dire of either Dang or Alires when it had the opportunity to do so.

■ At the third step of a *Batson* analysis, however, the question is not whether the prosecutor's explanation for the strike was factually correct, but whether it was a pretext to disguise a racial motive. Of course, the fact that an explanation appears factually incorrect is properly considered in making the ultimate determination of purposeful discrimination, but it is not determinative. Further, the prosecutor's failure to voir dire Alires does not make his facially valid explanation for dismissing her pretextual as a matter of law.

■ Defendant also ignores a significant part of the prosecutor's explanation for striking Alires, i.e, that he had no reason to know Alires was Hispanic. The prosecutor explained:

With respect to Ms. Alires, I don't know whether she's a minority or not. I have another defendant by the name of, I think Connie Fran—not Frances [—] Alires, and in that case, relatives of my defendant received a lot of property from this woman who worked in an optician shop. . . .

The prosecutor further stated, "I don't even know that Alires is a minority name." The prosecutor disputed Alires's ethnicity as soon as he was given the chance. Still, defendant failed to establish Alires's ethnicity conclusively on the record. Defendant has the burden of making an adequate record below. *See State v. Cantu,* 750 P.2d 591, 597 n. 7 (Utah 1988) (*Cantu I* ).

Defendant, citing *Cantu II,* claims the fact that Alires is arguably a Spanish surname is sufficient to identify her as a racial minority for *Batson* purposes. However, in *State v. Alvarez,* 872 P.2d 450, 457 n. 6 (Utah 1994), the Utah Supreme Court clarified any ambiguity it had created in *Cantu II.* The court explained "[i]n stating that 'Hispanics or Spanish surnamed persons are a "cognizable racial group" for purposes of equal protection analysis under *Batson,*' [in *Cantu II* ], we meant that Hispanics were a cognizable ethnic group, not that membership in that group could be established by surname alone." *Id.*[3] Utah courts have never found a Spanish surname alone sufficient to show minority status unless that minority status was corroborated by the trial court or the jurors themselves, or was undisputed.

■ Absent any indication on the record that the prosecutor should have known that Alires was Hispanic, whether or not the prosecutor lied when he denied such knowledge turns "primarily on [the trial court's] assessment of credibility." *Purkett,* 514 U.S. at 769, 115 S.Ct. at 1772. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 1869, 114 L.Ed.2d 395 (1991) (citations omitted). Because we accord great deference to a trial court's determination of fact, we cannot say the trial court committed

---

**3.** The *Alvarez* court observed, for example, that "an Hispanic surname by itself may not indicate group membership since a non-Hispanic woman may take the name of her Hispanic husband." *State v. Alvarez,* 872 P.2d 450, 457 n. 6 (citing *Aguilar v. State,* 826 S.W.2d 760, 762 (Tex.Ct. App.1992); *Rodriguez v. State,* 819 S.W.2d 920, 926 (Tex.Ct.App.1991)).

clear error when it accepted the prosecutor's explanation for his challenge as credible.

 Finally, we cannot say the trial court erroneously accepted the prosecutor's explanation that he dismissed Dang because she did not demonstrate a good "command of the English language." The record supports the prosecutor's concern. The jury questionnaire completed by Dang indicates an inability to understand what information was being requested of her.

Defendant did not carry his burden of persuasion in this case, and therefore we affirm the trial court's decision to deny defendant's *Batson* challenge.

## II. Cautionary Instruction

 Defendant next claims the trial court committed prejudicial error when it denied his request for a cautionary instruction. Defendant argues that the trial court was obligated to give the instruction pursuant to Utah Rule of Evidence 105, which states:

When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, *shall* restrict the evidence to its proper scope and instruct the jury accordingly.

(Emphasis added.) Although this instruction is often appropriate, *see, e.g., State v. Smith,* 700 P.2d 1106, 1110 (Utah 1985), it was not error to omit it in this case. The requested instruction would be contrary to the record in this case. Even though defendant's statements were admitted for impeachment purposes, they had also previously been admitted in the State's substantive case-in-chief without objection. Thus, defendant waived his right to this instruction.

## III. Prosecutorial Misconduct

 Finally, defendant contends that statements made by the prosecutor in his closing argument warrant reversal of his convictions. We conduct a two-part inquiry to determine whether prosecutorial remarks warrant reversal:

(1) did the remarks call to the attention of the jurors matters which they could not properly consider in determining their verdict, and (2) was the error substantial and prejudicial such that there is a reasonable likelihood that without the error the result would have been more favorable for the defendant.

*State v. Humphrey,* 793 P.2d 918, 925 (Utah. Ct.App.1990).

Specifically, defendant argues the prosecutor improperly commented on defendant's failure to call Kevin Mitchell to the stand. Defendant timely objected to the prosecutorial remarks, after which the prosecutor continued:

So, if—if [the State's failure to produce Mitchell is] such a big deal to [defendant], he has every opportunity to bring in everybody he wants, he has the subpoena power of the Court and so he wants you to think, boy, that's a big flaw in the State's case. That's no flaw in the State's case, all the evidence and all the information that he provided, you heard from the—from Deputy Cardon.

Defendant did not renew his objection when the prosecutor commented on the defendant's ability to subpoena witnesses, and made no motion for a mistrial. He now claims that the prosecutor's remarks effectively shifted the State's burden of proof onto defendant.

 We are not persuaded that the prosecutor's remarks constitute error. Defendant opened the door to these comments by arguing at length in his closing argument to the jury that it should acquit the defendant based solely on the State's failure to produce Mitchell, a key witness. The prosecutor was entitled to rebut the defendant's remarks. *Cf. United States v. Rosa,* 11 F.3d 315, 342 (2d Cir.1993) (finding no error when prosecutor commented on failure to call witness in rebuttal argument but did not suggest defendant had burden of proof or responsibility to put on evidence); *United States v. Clark,* 982 F.2d 965, 969 (6th Cir.1993) (finding no error when remarks made to rebut defendant's comment on State's failure to call same witness and remarks did not suggest defendant had burden of proof). ·

Because we find no error committed by the trial court, we affirm defendant's convictions.

BENCH and GREENWOOD, JJ., concur.