2010 UT App 136
State of Utah, Plaintiff and Appellee,
v.
Henry Louis Jackson, Defendant and Appellant.
Case No. 20080418-CA.
Court of Appeals of Utah.
Filed May 27, 2010.
This opinion is subject to revision before publication in the Pacific Reporter.
Lori J. Seppi, Salt Lake City, for Appellant.
Mark L. Shurtleff and Ryan D. Tenney, Salt Lake City, for Appellee.
Before Judges McHugh, Orme, and Greenwood.[1]

OPINION
ORME, Judge:
¶ 1 Defendant Henry Louis Jackson was convicted of several offenses, including attempted murder. On appeal, he raises many issues, including whether the trial court improperly admitted hearsay and photographs; whether the trial court erred in not dismissing the case after the State "destroyed" evidence in a vehicle used in the attempted murder; whether the State was racially motivated in striking a potential juror; and whether the trial court erred in reopening the case and in sentencing Defendant. We affirm.

BACKGROUND[2]
¶ 2 On November 9, 2006, a mother and her eighteen-year-old son returned home after picking up some lunch. As the mother began walking toward her apartment, she saw Defendant, her estranged boyfriend, parked nearby. She sat down on a curb and told her son, who was still by their car retrieving his pit bull, that Defendant was back. Defendant then drove toward the mother, hit her with his car, rolled back over her lower leg, and maneuvered the car so it appeared Defendant was going to hit her again. After giving his mother the pit bull, the son tried to stop Defendant by opening the front passenger door of Defendant's car and trying to hit him. According to the son, he did not make contact with Defendant.
¶ 3 Defendant had a large knife and cut the son's hand when the son tried to grab the knife. Defendant then stabbed the son's arm, whereupon the son retreated from the car and started running away.[3] Defendant chased the son and stabbed him again, inflicting additional wounds to his back and chest. After seeing Defendant stab her son in the back, the mother released the pit bull, and the dog chased Defendant. Defendant stopped pursuing the son and stabbed the pit bull in the throat. Defendant then approached the mother, "picked [her] up by [her] shirt," and started dragging her toward his car.[4] The mother testified that "he was hitting me in the head with the back of the knife telling me now talk to me bitch."[5] After letting the mother go, Defendant left the scene and was later arrested.
¶ 4 Three eyewitnesses testified at trial, two of whom were standing in a nearby doorway and yelling for the son to come toward them to safety and one who observed the events through her sliding-glass door. Collectively, the eyewitness testimony established that (1) there was a loud bang that sounded like a car crash; (2) the mother was on the ground, appeared injured, and was saying Defendant had hit her with the car; (3) Defendant, armed with a knife, left his car and chased the son while threatening to kill him; (4) Defendant stabbed the son in the back with the knife; (5) the pit bull approached Defendant, and Defendant stabbed the pit bull; and (6) Defendant then went back to the mother, who could barely stand, held the knife to her neck, and threatened to kill her.[6]
¶ 5 The State charged Defendant with two counts of attempted aggravated murder, first degree felonies, see Utah Code Ann. § 76-5-202(1)(i)(iii) (Supp. 2009) (aggravated murder), id. §§ 76-4-101, -102(1)(a) (2008) (defining attempt and classifying attempt offenses); one count of cruelty to animals, a class B misdemeanor, see id. § 76-9-301(2)(c), (3)(a) (2008); and one count of assault, a class B misdemeanor, see id. § 76-5-102(1)-(2).[7] Prior to trial, Defendant moved to dismiss the case, claiming that the State had destroyed evidence by releasing his car to its lienholder, which promptly cleaned the car and offered it for sale before Defendant was able to examine it. Defendant also claimed that the evidence in the car was crucial to his self-defense theory. He hoped to have obtained blood samples from the car that, upon testing, would have revealed canine blood in the car, which Defendant claims would have corroborated his claim that the pit bull attacked him, making self-defense necessary. At the hearing on the issue, it was clear that the State had taken blood samples from the car and, although the State had not submitted the samples for testing, the State indicated that it would "address the issue" if Defendant wanted to. The trial court denied Defendant's motion to dismiss, and the case proceeded to trial.
¶ 6 During jury voir dire, the State exercised one of its peremptory challenges on a prospective juror who had a high school education, worked as a mechanic, subscribed to "Car and Driver" magazine, and was deaf in one ear. Defense counsel objected to the strike pursuant to Batson v. Kentucky, 476 U.S. 79 (1986), arguing that the prospective juror was the only member of a minority group on the panel, though defense counsel could not "hazard to guess as to [the prospective juror]'s racial background." The State opposed the challenge by stating it struck the prospective juror due to his hearing problem and because he seemed too young. The State also pointed out the unlikelihood that the stricken juror would have served in any event, due to his position within the jury pool as number forty-six. In denying Defendant's Batson motion, the trial court apparently determined that the State was not racially motivated for the reasons the State offered.
¶ 7 The trial, held in December of 2007, was bifurcated so that only evidence on the underlying charges was presented to the jury, which found Defendant guilty on all counts. After the jury was released, the State presented the trial court with its evidence on the aggravating circumstance, i.e., Defendant's prior murder conviction. Defendant argued that the prior crime was not murder, but manslaughter. Defendant also requested additional time for briefing his position on the aggravating circumstance. When Defendant filed his brief, he challenged whether the State had sufficiently established his identity with regard to the previous conviction. At a hearing in January of 2008, the trial court allowed the State additional time to prove Defendant's identity based on the court's determinations that Defendant, having apparently conceded the identity issue during trial by making reference to Defendant's prior conviction, raised the identity issue for the first time after trial and that the witness who could authenticate the prior conviction was on military leave. The court also noted, in response to Defendant's objection, that it did not think the proceedings had been officially closed because it had allowed Defendant additional time for argument and submission of evidence.
¶ 8 At the next hearing, in April 2008, the trial court determined that the State had established Defendant's identity as it related to the previous murder conviction and, thus, had proven the aggravating circumstance. The court thereafter sentenced Defendant to two consecutive sentences of five years to life for the attempted aggravated murder convictions and 180 days of jail time for the two class B misdemeanors, with credit for time served.

ISSUES AND STANDARDS OF REVIEW
¶ 9 Defendant first argues that the trial court erred in admitting hearsay from two police officers, claiming that the testimony did not fall within the excited utterance or prior consistent statement exceptions. See Utah R. Evid. 803 (2), 801(d)(1)(B). When reviewing rulings on hearsay, we review "[l]egal questions regarding admissibility . . . for correctness,. . . questions of fact . . . for clear error," and the final "ruling on admissibility for abuse of discretion." State v. Rhinehart, 2006 UT App 517, ¶ 10, 153 P.3d 830 (citations and internal quotation marks omitted). Defendant also challenges the trial court's decision to admit photographic evidence, asserting that the relevance of the photographs was outweighed by their prejudicial impact under rule 403 of the Utah Rules of Evidence, see Utah R. Evid. 403. "A trial court's ruling under rule 403 is reviewed for abuse of discretion." State v. Bluff, 2002 UT 66, ¶ 47, 52 P.3d 1210, cert. denied, 537 U.S. 1172 (2003). Evidentiary errors on the part of the trial court will only be reversed if prejudicial. See State v. Calliham, 2002 UT 86, ¶ 45, 55 P.3d 573; State v. Dunn, 850 P.2d 1201, 1221 (Utah 1993).
¶ 10 Defendant additionally claims that the trial court erred in denying his motion to dismiss based on the State's destruction of evidence. "Whether the State's destruction of potentially exculpatory evidence violates due process is a question of law that we review for correctness. `However, because this question requires application of facts in the record to the due process standard, we incorporate a clearly erroneous standard for the necessary subsidiary factual determinations.'" State v. Tiedemann, 2007 UT 49, ¶ 12, 162 P.3d 1106 (citation omitted).
¶ 11 Next, Defendant challenges the trial court's decision to reopen the case to allow the State to present additional evidence on the aggravating circumstance. "A motion to reopen to take additional testimony when a case has been submitted to the court, but prior to the entry of judgment, is addressed to the sound discretion of the [trial] court." Lewis v. Porter, 556 P.2d 496, 497 (Utah 1976). "A court should consider a motion to reopen to take additional testimony in light of all the circumstances and grant or deny it in the interest of fairness and substantial justice." Id.
¶ 12 Defendant also asserts that the trial court improperly entered consecutive sentences without considering all the relevant factors. "We review sentences for abuse of discretion. 'An abuse of discretion may be manifest if the actions of the judge in sentencing were inherently unfair or if the judge imposed a clearly excessive sentence.'" State v. Valdez, 2008 UT App 329, ¶ 4, 194 P.3d 195 (citations omitted), cert. denied, 200 P.3d 193 (Utah 2008).
¶ 13 Finally, Defendant seeks reversal of the trial court's ruling on his Batson challenge, i.e., the court's determination that the State was not racially motivated in striking the prospective juror. The issue presented only involves analysis of the trial court's decisions at the second and third steps of its Batson review. The second step, a determination of whether the State presented a facially neutral reason for the strike, is reviewed for an abuse of discretion. See State v. Valdez, 2004 UT App 214, ¶ 17, 95 P.3d 291, rev'd on other grounds, 2006 UT 39, 140 P.3d 1219.[8] The third step, whether the State's actual motivation was discriminatory, is reviewed for clear error because it involves a weighing of the evidence. See id. ¶ 16.

ANALYSIS

I. Evidentiary Claims Failing Due to No Prejudice
¶ 14 Defendant has failed to demonstrate prejudice with regard to his arguments that the trial court improperly admitted hearsay under the criteria governing excited utterances, see Utah R. Evid. 803(2), and prior consistent statements, see id. R. 801(d)(1)(B), and that it improperly admitted photographs under rule 403, see id. R. 403. See generally State v. Calliham, 2002 UT 86, ¶ 45, 55 P.3d 573 ("Notwithstanding error by the trial court [in admitting evidence], we will not reverse a conviction if we find that the error was harmless."). Defendant claims the officers' testimony unfairly bolstered the victims' testimony, particularly with regard to how the altercation began, to which no other eyewitnesses testified. He reasons that without the officers' testimony reiterating and reinforcing the victims' version of how the altercation began, the outcome of the case would have rested on whether the jury found Defendant's self-defense theory, particularly that he was not the first aggressor, more credible than the victims' testimony that Defendant was the first aggressor when he ran over the mother with his car.
¶ 15 Defendant's theory, however, fails to take into account the eyewitnesses who heard what sounded like a car crash and who then observed the injured mother on the ground saying the Defendant had just hit her with his car. The eyewitnesses also saw Defendant get out of his car, chase the mother's son with a butcher knife while threatening to kill him, stab the son in the back, stab the pit bull in the throat, and then put the knife to the mother's throat while cursing and threatening her.
¶ 16 Even if Defendant was the first aggressor, when faced with such evidence reasonable minds clearly would conclude, beyond a reasonable doubt, that the risk of death or serious injury after the son retreated from Defendant's car was not imminent and that Defendant used unreasonable and unnecessary force to protect himself.[9] This defeats his self-defense theory. See Utah Code Ann. § 76-2-402(1) (2008) ("A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that force is necessary to defend himself or a third person against such other's imminent use of unlawful force. However, that person is justified in using force intended or likely to cause death or serious bodily injury only if he or she reasonably believes that force is necessary to prevent death or serious bodily injury to himself or a third person as a result of the other's imminent use of unlawful force[.]"); id. § 76-24-02(5) ("In determining imminence or reasonableness under Subsection (1), the trier of fact may consider, but is not limited to, any of the following factors: (a) the nature of the danger; (b) the immediacy of the danger; (c) the probability that the unlawful force would result in death or serious bodily injury; (d) the other's prior violent acts or violent propensities; and (e) any patterns of abuse or violence in the parties' relationship."); State v. Duran, 772 P.2d 982, 985 (Utah Ct. App. 1989) (discussing that the use of force to protect oneself must be "objectively reasonable") (citation and internal quotation marks omitted). See also State v. Wetzel, 868 P.2d 64, 69 (Utah 1993) (determining that even where the trial court erred in admitting hearsay, "reversal [wa]s not warranted" because any error was harmless when "the record indicate[d] that there was ample evidence to convict defendant even without" the hearsay and the defendant therefore did not "show a `reasonable likelihood that the error affected the outcome of the proceedings'") (citations omitted).
¶ 17 In any event, the alleged hearsay evidence was cumulative because it reiterated the essence of testimony presented by the victims or other eyewitnesses, even if the exact wording was different. Contrary to Defendant's assertion, the alleged additional evidence provided by one of the police officers, insofar as it went beyond the victims' own account of eventsnamely, that the mother said Defendant threatened to kill her after stabbing the sonwas also provided in an eyewitness's testimony. See State v. Thomas, 777 P.2d 445, 449-50 (Utah 1989) (holding that hearsay improperly admitted under the prior consistent statement exception was cumulative and not harmful in that it was unlikely to have changed the outcome of the trial).
¶ 18 The same is true of the photographic evidence. Irrespective of whether the photographs were properly admitted under rule 403 of the Utah Rules of Evidence, see Utah R. Evid. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice[.]"), Defendant has not demonstrated that the photographic depiction of the severe injuries he admittedly inflicted prejudiced the trial's outcome, especially in light of the highly descriptive eyewitness testimony negating his self-defense theory. See generally State v. Dunn, 850 P.2d 1201, 1221 (Utah 1993) (stating that "[e]ven if we find that the trial court's decision to admit [evidence under rule 403] was `beyond the limits of reasonability,' we will reverse only if the error was harmful, i.e., if absent the error there is a reasonable likelihood of an outcome more favorable to the defendant") (citations omitted).

II. Destruction of Evidence
¶ 19 Defendant's argument that the trial court erred in denying his motion to dismiss based on the State's destruction of evidence is also unavailing. He claims that the State violated his Due Process rights when it released his car to the lienholder, which cleaned the car's interior, potentially destroying evidence, before Defendant had an opportunity to inspect it.
¶ 20 When evaluating a motion to dismiss based on destruction of evidence, courts should consider the "nonexclusive factors" outlined in rule 16 of the Utah Rules of Criminal Procedure:
(1) the extent to which the prosecution's representation [of the existing evidence] is actually inaccurate, (2) the tendency of the omission or misstatement to lead defense counsel into tactics or strategy that could prejudice the outcome, (3) the culpability of the prosecutor in omitting pertinent information or misstating the facts, and (4) the extent to which appropriate defense investigation would have discovered the omitted or misstated evidence.
State v. Tiedemann, 2007 UT 49, ¶ 41, 162 P.3d 1106 (alteration in original) (citation and internal quotation marks omitted). Additionally, if a defendant establishes "a reasonable probability that lost or destroyed evidence would be exculpatory," courts also need to consider
(1) the reason for the destruction or loss of the evidence, including the degree of negligence or culpability on the part of the State; and (2) the degree of prejudice to the defendant in light of the materiality and importance of the missing evidence in the context of the case as a whole, including the strength of the remaining evidence.
Id. ¶ 44.
¶ 21 Here, the relevant factors favor the State and, thus, countenance against dismissal. Defendant claims that the car may have contained some of the pit bull's blood, which blood allegedly would have supported his self-defense theory by potentially establishing that the son and pit bull attacked first. Although Defendant may have been able to demonstrate that pit bull blood would have been found inside the car had the car not been returned to the lienholder and cleaned, any such blood within the car could have been attributed to having come from Defendant's person after he stabbed the pit bull in the throat.[10] Additionally, even if pit bull blood was in the car, the jury still could have concluded beyond a reasonable doubt that Defendant was guilty because the presence of pit bull blood in the car would not have significantly negated the other strong evidence supporting that Defendant became the aggressor when he left the car, that any danger was not immediate after the son retreated, and that Defendant's use of force was objectively unreasonable. Thus, Defendant has failed to establish that he was prejudiced by any destruction of evidence.
¶ 22 Additionally, the facts here simply do not speak of bad faith on the part of the State. After the State photographed and took blood samples from the car, it was taken by the lienholder and cleaned. This procedure suggests normal, routine cataloguing and disposition of evidence, not bad faith destruction.[11] Moreover, although the State chose not to test the retained blood samples, Defendant could have had those samples tested to see if any included canine blood, which Defendant apparently opted not to do. When considering that the presence of canine blood likely would not have changed the outcome of the trial and that the loss of the evidence does not suggest bad faith on the State's part, we affirm the trial court's denial of Defendant's motion to dismiss. See generally Tiedemann, 2007 UT 49, ¶ 45 ("The touchstone for the balancing process is fundamental fairness. If the behavior of the State in a given case is so reprehensible as to warrant sanction, a sanction might be available even where prejudice to the defendant is slight or only speculative. If prejudice to the defendant, on the other hand, is extreme, fairness may require sanction even where there is no wrongdoing on the part of the State. In between those extremes, we have confidence that trial judges can strike a balance that preserves defendants' constitutional rights without undue hardship to the prosecution.").

III. Reopening the Case
¶ 23 Defendant has not succeeded in showing that the trial court abused its discretion in reopening the case to allow the State to present evidence of his identity with regard to his prior conviction. See Lewis v. Porter, 556 P.2d 496, 497 (Utah 1976) (stating that a trial court's decision to reopen a case is within "the sound discretion of the [trial] court"). Even if defense counsel's statements at trial regarding Defendant's prior conviction did not technically amount to an admission of identity, and even if the documents the State submitted during the trial did not conclusively prove his identity, the trial court did not abuse its discretion in reopening the case. The trial court's actions were justified when defense counsel's statements during the relevant proceedings suggested that identity was not an issue; when during trial the State produced documents to establish Defendant's prior conviction and stated its belief that Defendant's name on the documents was sufficient to establish Defendant's prior conviction and Defendant neither objected nor argued that the evidence produced did not establish Defendant's identity; and when Defendant first disputed his identity through additional briefing the court allowed following the trial. Under these circumstances, where Defendant essentially misled the State and the court, or at least fostered the State's and the court's misperception that identity was not an issue, it was entirely fair, and in the interest of justice, for the trial court to exercise its discretion and reopen the case so the State could admit additional evidence conclusively establishing Defendant's identity.[12] See id. ("A court should consider a motion to reopen to take additional testimony in light of all the circumstances and grant or deny it in the interest of fairness and substantial justice."); Davis v. Riley, 20 Utah 2d 325, 437 P.2d 453, 455 (1968) ("[W]hen a case has . . . been submitted to the court[,] whether [it] will allow the presentation of further evidence is ordinarily a matter of discretion. . . . The word `discretion' itself imports that the action should be taken with reason and in good conscience, and with an understanding of and consideration for the rights of the parties, for the purpose of serving the always desired objective of doing justice between them.").

IV. Consecutive Sentences
¶ 24 Defendant's argument that the trial court abused its discretion in sentencing him to "two terms of five years to life consecutively," without "adequately consider[ing]" his rehabilitative needs and that his convictions came from "one criminal episode," also fails.[13] "In determining whether state offenses are to run concurrently or consecutively, the court shall consider the gravity and circumstances of the offenses, the number of victims, and the history, character, and rehabilitative needs of the defendant." Utah Code Ann. § 76-3-401(2) (2008) (emphasis added). The statute specifically authorizes the court to "impose consecutive sentences for offenses arising out of a single criminal episode." Id. § 76-3-401(5).
¶ 25 In this case, the court clearly heard information regarding the likelihood of Defendant's rehabilitation, i.e., the State's evidence that Defendant's assault on the mother was preceded by Defendant serving time for killing his wife and for a parole violation related to another domestic violence incident. And at the sentencing hearing, Defendant's counsel pointed out that the convictions resulted from a single criminal episode. Defendant has not provided any detailed argument that the trial court's consideration of these facts was inadequate. Cf. State v. Galli, 967 P.2d 930, 938 (Utah 1998) (determining that the trial court abused its discretion in ordering consecutive sentences when the record showed that the defendant "did not inflict any physical injuries" and "was incapable of inflicting serious injury" given the fact he was using a pellet gun; "the amount of money taken. . . was relatively small"; the defendant's "prior criminal history consisted of minor traffic offenses and one misdemeanor theft conviction"; "[the defendant] voluntarily confessed and admitted responsibility" and he "expressed a commitment and hope to improve himself"; and the defendant's actions during his flight from justice demonstrated "he ha[d] the ability to improve himself and become a productive, law-abiding citizen"); State v. Strunk, 846 P.2d 1297, 1302 (Utah 1993) ("[T]he trial court abused its discretion in failing to sufficiently consider defendant's rehabilitative needs in light of his extreme youth and the absence of prior violent crimes."). Therefore we cannot say that the trial court abused its discretion in ordering consecutive sentences based on inadequate consideration of Defendant's rehabilitative needs and the fact that a single criminal episode defines the nature of the criminal activity for which he was convicted. See generally State v. Valdez, 2008 UT App 329, ¶ 8, 194 P.3d 195 ("[A] trial court need not state to what extent it considered each of the statutory factors at the sentencing hearing.") (citation and internal quotation marks omitted), cert. denied, 200 P.3d 193 (Utah 2008).
¶ 26 Defendant's argument that the court "failed to consider that [the mother]'s injuries were relatively minor" is also without merit. The same judge presided over all relevant proceedings, i.e., the underlying jury trial, the proceedings regarding the aggravating circumstances, and the sentencing hearing. Therefore, the court was fully cognizant of the details of the crime and the extent of the injuries inflicted. Cf. State v. Helms, 2002 UT 12, ¶¶ 12-13, 40 P.3d 626 (upholding sentence when the record showed the trial court reviewed a presentence report that had information regarding all the factors); id. ¶ 14 ("[T]he fact [the defendant] views his situation differently than did the trial court does not prove that the trial court neglected to consider the factors . . . . Indeed, . . . sentencing reflects the personal judgment of the court, and consequently, a sentence imposed by the trial court should be overturned only when it is inherently unfair or clearly excessive."). In sum, the record shows that evidence bearing on all the statutory factors was before the trial court and considered by it, and the evidence readily supports the conclusion that the trial court did not abuse its discretion in ordering consecutive sentences.

V. Batson Challenge
¶ 27 Finally, irrespective of whether Defendant waived his Batson challenge,[14] see Batson v. Kentucky, 476 U.S. 79, 88-99 (1986) (determining Equal Protection Clause is implicated if counsel uses peremptory challenges solely on the basis of race), Defendant has not convinced us that the State violated the Equal Protection Clause in the course of jury selection. In general, during the jury selection process parties are "permitted to exercise their peremptory challenges for virtually any reason, or for no reason at all." State v. Cannon, 2002 UT App 18, ¶ 6, 41 P.3d 1153. Accord Utah R. Crim. P. 18(d) ("A peremptory challenge is an objection to a juror for which no reason need be given."). However, "parties in a criminal action may not discriminate against potential jurors by exercising peremptory challenges solely on the basis of race." State v. Colwell, 2000 UT 8, ¶ 14, 994 P.2d 177.
¶ 28 Courts employ a three-step analytical process to evaluate the merits of a Batson challenge. See id. ¶¶ 17-20; Cannon, 2002 UT App 18, ¶¶ 7-11. The opponent of the strike, Defendant here, "must first make out the prima facie case by presenting facts adequate to raise an inference of improper discrimination." Colwell, 2000 UT 8, ¶ 18. Then, if the trial court determines that the opponent met his or her burden of proving a prima facie case, the burden shifts to the proponent of the strike, the State here, to provide a facially neutral reason for its use of the peremptory challenge. See id. ¶ 19; Cannon, 2002 UT App 18, ¶¶ 9-10. "This [second] step `does not demand an explanation that is persuasive, or even plausible,'" Cannon, 2002 UT App 18, ¶ 9 (quoting Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curiam)), and "`need not rise to the level justifying exercise of a challenge for cause,'" Colwell, 2000 UT 8, ¶ 22 (quoting Batson, 476 U.S. at 97). A reason will be considered "facially valid," Cannon, 2002 UT App 18, ¶ 10, if it is "(1) neutral, (2) related to the case being tried, (3) clear and reasonably specific, and (4) legitimate," Colwell, 2000 UT 8, ¶ 22 (citation and internal quotation marks omitted). The requirement that the explanation be legitimate does not mean "a reason that makes sense, but a reason that does not deny equal protection." Purkett, 514 U.S. at 769. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Id. at 768 (citation and internal quotation marks omitted). Accord Colwell, 2000 UT 8, ¶ 19.
¶ 29 Finally, under the third step, if the State has succeeded in providing a facially neutral explanation, the trial court then must evaluate all the evidence before it and determine whether the State's explanation for its peremptory challenge, although facially neutral, was actually just "a pretext to disguise a racial motive." Cannon, 2002 UT App 18, ¶ 11. In doing so, "trial courts [need to] `undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" State v. Pharris, 846 P.2d 454, 461 (Utah Ct. App.) (quoting Batson, 476 U.S. at 93) (additional citation and internal quotation marks omitted), cert. denied, 857 P.2d 948 (Utah 1993).
[T]he presence of one or more of [the following] factors will tend to show that the state's reasons are not actually supported by the record or are an impermissible pretext:
(1) alleged group bias not shown to be shared by the juror in question, (2) failure to examine the juror or perfunctory examination, assuming neither the trial court nor opposing counsel had questioned the juror, (3) singling the juror out for special questioning designed to evoke a certain response, (4) the prosecutor's reason is unrelated to the facts of the case, and (5) a challenge based on reasons equally applicable to juror[s] who were not challenged.[15] State v. Cantu, 778 P.2d 517, 518-19 (Utah 1989) (citation and internal quotation marks omitted). As this determination rests largely on credibility, an appellate court will only set aside a trial court's factual determinations under step three if they are clearly erroneous. See id. at 518.
¶ 30 In this case, the trial court determined that Defendant had made a prima facie case of racial motivation. The State then explained that it used a peremptory challenge on the prospective juror due to his young age and deafness in his right ear.[16] In denying Defendant's Batson motion, the trial court apparently accepted these reasons as facially neutral and not given as a pretext.
¶ 31 Our analysis of this case's specific facts, then, begins with Batson's second step because, as the parties agree, once the State has "offered [an] explanation for the peremptory challenge[] and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant has made a prima facie showing [as required under Batson's first step] becomes moot." State v. Chatwin, 2002 UT App 363, ¶ 9, 58 P.3d 867 (first alteration in original) (citation and internal quotation marks omitted), cert. denied, 67 P.3d 495 (Utah 2003). The State satisfied Batson's second step by providing reasons for its peremptory challenge, i.e., youth and a hearing impairment, that were facially neutralnot "peculiar to any race"and related to the case at hand.[17] See Colwell, 2000 UT 8, ¶¶ 15, 19, 22 (stating the neutrality requirements and determining that the State's proffered reason for its peremptory strike of a potential juror who "was `quite elderly [and] has difficulty hearing'" was "facially valid because `discriminatory intent [wa]s [not] inherent' in the prosecutor's explanation") (first and third alterations in original) (citation omitted). See generally Purkett, 514 U.S. at 766, 769 (discussing that the prosecution struck a potential juror because he had "long, . . . curly, unkempt hair" and "a mustache and a goatee type beard," which characteristics made him seem like he would "not be a good juror," and he was "suspicious to" the attorney, and determining that these reasons passed step two because such physical characteristics were not "peculiar to any race") (citations and internal quotation marks omitted); Cannon, 2002 UT App 18, ¶ 10 (determining that although the prosecution's explanation that it struck a juror because "he had difficulty explaining himself, [and was] one of the more undereducated people" on the panel was somewhat "suspect," it passed the facial neutrality requirement of step two);[18] State v. Harrison, 805 P.2d 769, 777 (Utah Ct. App.) (indicating that one minority juror had been excused for cause due to hearing issues), cert. denied, 817 P.2d 327 (Utah 1991). The State's proffered reasons also satisfied Batson's second step requirements that the reasons be specific and legitimate, i.e, no "discriminatory intent [wa]s inherent in the prosecutor's explanation." Purkett, 514 U.S. at 768. See Colwell, 2000 UT 8, ¶ 22. Therefore, we conclude that the State presented a racially neutral explanation that justified its peremptory challenge.
¶ 32 Under Batson's third step, Defendant initially claims that the State's reasoning that the stricken juror was "to[o] young" was just a pretext and points to several potential jurors that the State did not strike who were about the same age. See Cantu, 778 P.2d at 518-19 (stating that one factor that "will tend to show that the state's reasons are . . . an impermissible pretext [is] a challenge based on reasons equally applicable to juror[s] who were not challenged"). However, only one of those other potential jurors was also not married, had no children, and was not attending college. That other potential juror, however, rather than subscribing to "Car and Driver," subscribed to "Time" magazine and did not indicate that he had a hearing impairment. Accordingly, as the State points out, no other juror had all key characteristics in common with the stricken juror. See United States v. Hughes, 970 F.2d 227, 231-32 (7th Cir. 1992). And based on a comparison of the stricken juror with the other potential jurors, the State legitimately could have concluded that his youth, limited life experience, and reading interests made him one of the less sophisticated potential jurors and, therefore, not a person it wanted on the jury, irrespective of his race. See generally State v. Cosey, 873 P.2d 1177, 1179 (Utah Ct. App.) ("[T]he selection of a jury is inevitably a call upon experience and intuition. The trial lawyer must draw upon his own insights and empathetic abilities.") (citation and internal quotation marks omitted), cert. denied, 883 P.2d 1359 (Utah 1994).
¶ 33 Second, Defendant suggests that the State's stated reason for striking the prospective juror, namely that he is deaf in one ear, was also pretextual because the State "could have questioned him further" after he responded affirmatively when the court asked if he was able to hear the judge. Although "failure to examine the juror or perfunctory examination" by the State is one factor the court considers when determining if the strike was a pretext for racial discrimination, "the prosecutor's failure to voir dire [the prospective juror] does not make his facially valid explanation for dismissing [him] pretextual as a matter of law." State v. Bowman, 945 P.2d 153, 155-56 (Utah Ct. App. 1997). And, although the stricken juror indicated that he had thus far been able to hear the proceedings, from the cold record we have no way of knowing if his bearing or mannerisms indicated otherwise or at least suggested cause for concern. Cf. Cosey, 873 P.2d at 1179-80 ("This court has . . . recognized the difficulty of trying to assess what counsel was thinking during jury selection, because of our inability, on appeal, to view the jurors and assess their potential bias. Only those present, the court and counsel, have that advantaged view. . . . [T]he transcript reveals nothing about [the juror's] demeanor or other intangible characteristics that constitute the collage of attributes attorneys assess in choosing jurors. For all we know [he] was . . . the only one who glanced disparagingly at the prosecution or sympathetically toward the defendant. Our review of counsel's performance is inherently hampered by our necessary reliance on only the lifeless transcript to assess the dynamic and highly judgmental process of jury selection.") (second and third alterations in original) (citations and internal quotation marks omitted). In any event, the fact the stricken juror was deaf in one ear provided a specific and legitimate basis, irrespective of his race, that would warrant the prosecution in being concerned about whether he would, in actuality, be able to fully hear and understand the proceedings. See State v. Colwell, 2000 UT 8, ¶¶ 15-19, 994 P.2d 177
¶ 34 Given all the evidence and circumstances before the trial court, and with due deference to the trial court's ability to judge the credibility of the attorneys and to personally observe the prospective juror peremptorily stricken by the State, see Cosey, 873 P.2d at 1179-80, we affirm the court's determination that the evidence as a whole did not suggest racial motivation in striking him from the jury.[19]

CONCLUSION
¶ 35 Even if the trial court erred in admitting hearsay and photographs, Defendant has not demonstrated any prejudice caused by such evidence. Defendant has also failed to establish that, in light of balancing the relevant factors, fundamental fairness required dismissal of his case after evidence in the vehicle was destroyed. The trial court did not err in reopening the case to give the State an opportunity to conclusively prove Defendant's identity with regard to the aggravating circumstance. Defendant requested additional briefing on the aggravating circumstance and gave no indication that identity was an issue until the additional briefing. Defendant's counsel also made statements at trial fostering the court's and the State's misconception that identity was not at issue. The decision imposing consecutive sentences is sustainable because the record shows that the trial court had evidence on all the relevant sentencing factors before it and adequately considered those factors. Finally, the trial court's determination that Defendant's Batson challenge failed because the State was not racially motivated in peremptorily striking a prospective juror is supported by the evidence.
¶ 36 Affirmed.
¶ 37 WE CONCUR: Carolyn B. McHugh, Associate Presiding Judge, and Pamela T. Greenwood, Senior Judge.
NOTES
[1] Judge Pamela T. Greenwood participated in this case as a regular member of the Utah Court of Appeals. She retired from the court on January 1, 2010, before this decision issued. Hence, she is designated herein as a Senior Judge. See Utah Code Ann. § 78A-3-103(2) (2008); Sup. Ct. R. of Prof'l Practice 11-201(6).
[2] Our recitation of the facts is drawn from the testimony of the victims and eyewitnesses, presented in the light most consistent with the jury verdict. See generally State v. Hales, 2007 UT 14, ¶ 36, 152 P.3d 321 ("[W]e review the evidence and all inferences which may reasonably be drawn from it in the light most favorable to the verdict of the jury.") (citation and internal quotation marks omitted). Defendant did not testify at trial. In stating the facts, we have not drawn on testimony presented by the investigating officers to which Defendant objects.
[3] In raising his self-defense theory, Defendant pointed to the son's size. The son weighed approximately 320 pounds and stood over six feet tall.
[4] In support of his theory that the son and pit bull actually started the altercation when the son approached the car, and that Defendant was only defending himself, Defendant challenged the credibility of the victims' version of events as thus far outlined. In argument at trial, Defendant's counsel pointed to Defendant's history with the victims, including that he and the mother had been "on again, off again lover[s]," that he and the son had recently had a confrontation, and that the mother sustained relatively minor injuries for having been hit by a car. Defense counsel also suggested that it was unlikely the son would have given the mother the pit bull before approaching Defendant's car. Defense counsel posited that the victims concocted their version of events to avoid criminal liability for the son's having first attacked Defendant. As indicated in our discussion of the evidentiary issues, however, the evidence presented by the State sufficiently negated Defendant's self-defense theory beyond a reasonable doubt.
[5] Defendant apparently had been helping the victims move and, according to the mother, was angry because she originally had refused to tell him where she was moving.
[6] To avoid unnecessary repetition in detailing what each eyewitness observed or heard, we describe the eyewitnesses' testimony as a whole, while acknowledging that not every eyewitness saw or heard the entire incident as we have summarized it.
[7] We cite to the current versions of the statutes as recent amendments have no bearing on our analysis. See Utah Code Ann. § 76-5-202 amendment notes (2008 & Supp. 2009); id. §§ 76-4-101 amendment notes, -102 amendment notes (2008); id. § 76-9-301 amendment notes (2008); id. § 76-5-102 history (2008).
[8] In State v. Valdez, 2006 UT 39, 140 P.3d 1219, the Utah Supreme Court explicitly declined to address the issue of whether this court applied the correct standard of review in State v. Valdez, 2004 UT App 214, 95 P.3d 291. See 2006 UT 39, ¶ 12.
[9] Under Utah's self-defense jurisprudence, it is true that "a person does not have a duty to retreat" when the incident occurs "in a place where" he has a lawful right to remain. Utah Code Ann. § 76-2-402(3) (2008). However, the fact that Defendant was in his car and could have simply driven away to safety after the son retreated from Defendant's car does bear on the issue of whether the perceived danger was imminent and whether Defendant reasonably feared death or serious injury so as to justify the force he used. See id. § 76-2-402(1); State v. Duran, 772 P.2d 982, 985 (Utah Ct. App. 1989).
[10] Witness testimony reflected that the pit bull "was bleeding profusely" and "continually," and that "the blood was just squirting out of his neck."
[11] At oral argument, the State indicated for the first time that the blood evidence in the vehicle had been "destroyed" earlier than it had previously thought. Counsel for Defendant made a motion in open court for further briefing on the issue of bad faith in light of this new information. We deny counsel's motion because, as indicated, the facts here simply do not suggest bad faith when the evidence was only destroyed after numerous photographs and blood samples were obtained, especially when it appears that such photographs and samples could have been made available to Defendant upon request. Nor was the evidence destroyed for its own sake but, rather, as a result of delivering the car to the lienholder entitled to its possession.
[12] Defendant also has not persuaded us that the trial court abused its discretion in allowing the State time to gather evidence in light of the reason for reopening the case and the fact that the witness who could authenticate photographs from the 1982 case was on military leave. Contrary to what Defendant suggests through limited argument on the issue, we do not see that the Double Jeopardy Clause was implicated here, see generally U.S. Const. amend. V; Utah Const. art. I, § 12; Tibbs v. Florida, 457 U.S. 31, 41 (1982), because there was never an acquittal or dismissal for insufficient evidence, see State v. Jackson, 857 P.2d 267, 269 n.1 (Utah Ct. App. 1993). In this case, the trial court delayed ruling on the aggravating circumstance to allow additional argument and briefing by the parties as Defendant requested. As the trial court indicated at the subsequent hearing, which hearing was contemplated at the conclusion of the trial, it questioned whether the proceedings had even been completely closed based on the additional briefing and argument it allowed. And although State v. Gregorious, 81 Utah 33, 16 P.2d 893 (1932), and State v. Seel, 827 P.2d 954 (Utah Ct. App.), cert. denied, 836 P.2d 1383 (Utah 1992), both mentioned, in affirming the trial courts' decisions to reopen in those cases, that no delay was entailed by reopening, it does not necessarily follow that if some delay will occur, the trial court abuses its discretion in reopening. See Gregorious, 16 P.2d at 895; Seel, 827 P.2d at 962.
[13] In a single sentence, without legal argument beyond mere citation to authority, Defendant also claims that the trial court "improperly limited the [Parole] Board's discretion `to release' [Defendant] when he is rehabilitated." We decline to address the issue further, especially given Defendant's failure to demonstrate preservation of this issue. See Utah R. App. P. 24(a)(9) (requiring briefs to contain legally supported arguments and record citations).
[14] The State has raised the issue of whether Defendant's Batson challenge was timely or, more accurately, whether Defendant waived the Batson challenge in not pressing the trial court to rule on the issue prior to swearing in the jury and dismissing the venire. In light of our decision to address the merits of the challenge, we do not reach the interesting issue of whether prior case law clearly required defense counsel to insist upon a ruling prior to dismissal of the venire. See State v. Valdez, 2006 UT 39, 140 P.3d 1219 (decided before Defendant's trial); State v. Rosa-Re, 2008 UT 53, 190 P.3d 1259 (decided after Defendant's trial). See generally Valdez, 2006 UT 39, ¶ 19 (discussing that the United States Supreme Court has declined to "set forth . . . specific guidelines regarding [the] timeliness" of Batson challenges but that it has "held that `only a firmly established and regularly followed state practice may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim'") (second omission in original) (quoting Ford v. Georgia, 498 U.S. 411, 423-24 (1991)). See also Rosa-Re, 2008 UT 53, ¶¶ 13-14 ("clarify[ing] that in the future. . . trial courts have an obligation to resolve Batson objections before the jury is sworn and the venire dismissed," that "defense counsel also has an absolute obligation to notify the court that resolution is needed before the jury is sworn and the venire dismissed," and that defense counsel's "[f]ailure to do so . . . will in the future constitute a waiver of the original objection"); Valdez, 2006 UT 39, ¶ 33 n.19 ("We note that this procedure, whereby an objection was made prior to the swearing of the jury but not addressed by the court until after the jury was sworn in and dismissed, will generally not meet the standard we set forth today.").
[15] We recognize that Utah case law is not entirely clear on whether a trial court is supposed to consider these additional factors under step two of the analysis (as bearing on whether the proffered reason for the strike is facially neutral), or under step three (as bearing on whether the purportedly facially neutral reason is actually a pretext for discrimination). Compare State v. Cantu, 778 P.2d 517, 518-19 (Utah 1989) (listing and considering these factors as part of its analysis under step two and not identifying step three), and State v. Pharris, 846 P.2d 454, 463-64 (Utah Ct. App.) (listing and considering these factors as part of its analysis under step two), cert. denied, 857 P.2d 948 (Utah 1993), with State v. Cannon, 2002 UT App 18, ¶¶ 11-16, 41 P.3d 1153 (discussing these factors under step three of the analysis), and State v. Bowman, 945 P.2d 153, 155-56 (Utah Ct. App. 1997) (same). Based on Purkett v. Elem, 514 U.S. 765 (1995) (per curiam), we conclude the best place to consider these factors is at step three of the analysis when the persuasiveness of the prosecution's reason is appropriately considered by the trial court.

In Purkett, the United States Supreme Court determined that the federal court of appeals had "erred by combining Batson's second and third steps into one" and emphasized that the persuasiveness of the reason is only relevant at step three. Id. at 768. It also recognized that the court of appeals was probably led astray by language in Batson indicating that to be race-neutral "the proponent of a strike must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges." Id. (citation and internal quotation marks omitted). The Purkett court clarified that "legitimate" did not refer to whether the reason made sense, but whether it denied equal protection. See id. at 768-69. Notably, the cases we cite that discuss the factors at the second step were decided before Purkett, see Cantu, 778 P.2d at 517; Pharris, 846 P.2d at 454, and the cases discussing the factors at the third step were decided after Purkett, see Cannon, 2002 UT App 18; Bowman, 945 P.2d at 153. The decision in the later cases to adjust the analysis was likely in response to the clarification of the required analytic steps in Purkett. In any event, based on Purkett, we conclude that the factors bear on the persuasiveness of the reason and are appropriately considered at the third step.
We also clarify, however, to the extent the later cases indicate otherwise, see Cannon, 2002 UT App 18, ¶¶ 9, 12-13; Bowman, 945 P.2d at 155-56, that whether the reason is "(1) neutral, (2) related to the case being tried, (3) clear and reasonably specific, and (4) legitimate," State v. Colwell, 2000 UT 8, ¶ 22, 994 P.2d 177 (citation and internal quotation marks omitted), is appropriately considered at step two under Batson and Purkett. See Purkett, 514 U.S. at 768-69; Batson v. Kentucky, 476 U.S. 79, 98 & n.20 (1986).
[16] As discussed in paragraphs 31-33, infra, case law supports that these reasons were racially neutral and that the trial court properly determined the reasons were not a pretext under step three. However, based on a recent statutory amendment that became effective after Defendant's trial, see Utah Code Ann. § 78B-1-103(2) amendment notes (2008), striking a juror based on age or disability will no longer be legal, see id. § 78B-1-103(2) ("A qualified citizen may not be excluded from jury service on account of race, color, religion, sex, national origin, age, occupation, disability, or economic status.") (emphasis added).
[17] Whether a juror can hear the proceedings is a relevant concern because a lack of hearing always could affect the outcome of the case if such a juror caught only a portion of the evidence and arguments. See State v. Colwell, 2000 UT 8, ¶ 22, 994 P.2d 177 (stating that a "juror's hearing capacity . . . would have affected the case to be tried"). Although the State did not elaborate on why hearing was particularly relevant to its case when presenting its reasons to the trial court, whether jurors can hear does seem necessarily relevant. At certain times during the trial, the State asked witnesses to step away from the witness stand, and thus the microphone, to review and mark certain exhibits and continued to question those witnesses during those times.
[18] This court, however, ultimately remanded in Cannon based on the trial court's failure to adequately explain its ruling regarding the prosecution's explanation and credibility. See State v. Cannon, 2002 UT App 18, ¶¶ 14-16, 41 P.3d 1153.
[19] Although the trial court's ruling could have been more detailed, see State v. Cannon, 2002 UT App 18, ¶¶ 11-12, 14-16, 41 P.3d 1153 (discussing the necessity of a complete record and assessment of the relevant facts and law with regard to a Batson challenge), Defendant has not challenged the adequacy of the trial court's ruling, but only the sufficiency of the evidence to support it.